THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* BENJAMIN SCHARFSTEIN and HARRY GOLD, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* BENJAMIN SCHARFSTEIN and EUGENE RAICUS, Defendants.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* BENJAMIN SCHARFSTEIN, EUGENE RAICUS and CHARLES MOIEL. Defendants.

Supreme Court, Criminal Term, Queens County, February 23, 1967.

*Kleinman, Gold & Landsman* (*Eugene Gold* of counsel), for Benjamin Scharfstein, defendant. *Peirez & Gallop* (*Lawrence Peirez* of counsel), for Harry Gold, defendant. *Freeman & Hyman* (*Harold Hyman* of counsel), for Eugene Raicus, defendant. *Herbert J. Miller* and *Bertram Miller* for Charles Moiel, defendant. *Thomas J. Mackell, District Attorney* (*Lawrence T. Gresser* of counsel), for plaintiff.

J. IRWIN SHAPIRO, J. The defendant Scharfstein, indicted on a charge of abortion, has moved "to suppress any evidence the People may have obtained or received by reliance upon or by means" of a wiretap or electronic device "after the date of the People's having obtained the original wiretap order, or any extensions or renewals thereof, upon which any evidence, physical, written or otherwise was obtained" against him. The defendants Gold and Raicus made similar applications. The defendant Moiel made no motion but was permitted to join in the motions of the other defendants at the consolidated hearing which was ordered on their motions.

The issue posed by the motions is whether the fact that the identity of a witness is learned by means of an illegal wiretap on a defendant's telephone requires suppression of the testimony of that witness even though he was not informed of the wiretap and was not induced to testify by reason thereof. Although diligently researched, I have been unable to find any State or Federal case squarely in point.

### THE CHARGES CONTAINED IN THE INSTANT INDICTMENTS AND THE ACTIONS TAKEN PREVIOUSLY WITH RESPECT TO THE WIRETAP ORDER

The three indictments involved here were returned on June 18, 1964 and each charged conspiracy to commit and the commission of abortions. Indictment No. 1086/64 is against defendants Scharfstein and Gold for abortions upon S. M. and A. F.; Indictment No. 1087/64 is against defendants Scharfstein and Raicus for abortions upon C. M. and M. E.; and Indictment No. 1088/64 is against defendants Scharfstein, Raicus and Moiel for abortions upon P. L. and A. M.

At about the time the indictments in these matters were returned, Scharfstein, Gold and Raicus were also indicted, in three indictments, in Kings County for the crime of abortion. In those cases the defendants made a motion "to suppress the evidence seized from the defendant (Gold) or from his office on 1745 Caton Avenue, in the County of Kings on May 12, 1964, and to suppress any evidence the People may have received via a wiretap or through any electronic eavesdropping, and to sup-

press any confession or statement given to them by Dr. Gold * * * on or after May 12, 1964." After a hearing held before me, I granted defendants' motion on May 24, 1965 " to the extent of vacating the original wiretap order, all renewals thereof, and all *evidence* obtained in *reliance* thereon " for the reason that the order permitting the tapping of Gold's telephone was predicated upon an affidavit by a police official which was insufficient as a matter of law (*People* v. *Gold,* 46 Misc 2d 495).

Thereafter the instant motions were made and, as has been noted, a hearing was ordered.

The testimony at the hearing established that the identity of the women aborted was learned from the interception by a wiretap on Gold's telephone pursuant to the order which I vacated in Kings County (46 Misc 2d 495, *supra*) or from leads obtained by a similar interception on Scharfstein's telephone. The order for the wiretap on Scharfstein's telephone was based upon an affidavit of the same nature as that in the *Gold* case.

Preliminarily, therefore, if the order entered in Kings County vacating the order for the wiretap on Gold's telephone did not also vacate the order which authorized the placing of a wiretap on Scharfstein's telephone, then, for the purposes of this motion, I hold that the basis for the wiretap on Scharfstein's telephone was insufficient as a matter of law and that order therefore is hereby vacated. (See *People* v. *McCall,* 17 N Y 2d 152, 160.)

### THE OPERATIVE FACTS

The precise way in which the identity of and leads to the women aborted were obtained by the police appears from the testimony of Policewoman Merkel, the only witness called at the hearing, and is as follows:

*As to S. M.* (first three counts of Indictment No. 1086/64) : On May 19, 1964, she went to S. M.'s home and told S. M. that they had reason to believe that she had had an abortion performed; that she had been followed to Gold's office and they assumed that she had been aborted; that the District Attorney wanted to speak to her in connection with an investigation he was conducting, that she had a subpœna for her, and that they had transportation outside if she wanted to come with them. Asked how she got S. M.'s name, she replied that she got S. M.'s name from the girl who followed Gold and Scharfstein " that night " and returned with S. M.'s address. The policewoman testified that she had no knowledge whether this observation was a result of a telephone conversation between Scharfstein and Gold setting up an appointment (the transcript of an intercepted telephone communication between Gold and Scharfstein on February 25, 1964,

marked defendant's Exhibit B, shows that an appointment to meet at the hospital was made). She also told S. M. that she did not have to go with them on the subpœna; that she could call a lawyer; that if she wanted to go then, they had a car outside for her convenience, otherwise she could come later. S. M. agreed to go at that time and they proceeded to the District Attorney's office where S. M. gave her a statement in writing. She did not state to S. M., in words or substance, "you better tell us the truth because we know that you had an abortion, the information came over the wiretap", nor did she at any time play back any tapes or show S. M. any transcripts from those tapes.

*As to A. F.* (last three counts of Indictment No. 1086/64): As a result of information given by fellow officers of what they had heard on a wiretap, the policewoman knew that A. F. was coming to Gold's office in Brooklyn on February 26, at about 6:00 P.M. Therefore she went to the vicinity of Gold's office on that day and, at 6:55 P.M., she observed two people drive up. She made a note of the license number on the plates, and when the two came out of Gold's office, she and Policewoman Johnston followed them to Queens, where A. F. entered a house.

As to C. M. (first three counts of Indictment No. 1087/64): No testimony was adduced at the hearing regarding this alleged abortion. The two transcripts of the intercepted telephone conversations regarding C. M. were of conversations between defendant Scharfstein and C. M. and were apparently after the commission of the alleged abortion.

*As to M. E.* (last three counts of Indictment No. 1087/64): On April 22, 1964, at about 12:30 P.M., the police maintained a stake-out at the home of M. E. as the result of an intercepted telephone conversation between Scharfstein and Raicus arranging an appointment to be there at that time. Scharfstein and Doctor Raicus were seen to arrive, enter M. E.'s home and remain there for 45 minutes. On May 19, 1964 M. E. appeared at the District Attorney's office with her attorney after a forthwith subpœna had been served upon her that morning. Policewoman Merkel told M. E. that she was there with reference to an abortion performed upon her; that she was stationed outside her home when the two men came there; and that the police had reason to believe that an abortion had been performed upon her. She did not tell M. E. that the appointment for the abortion was made on the telephone; she "just told her that [they] had been following these people for quite a while and that on one occasion [they] had followed them to her house". She also told M. E. that she would get immunity if she told them the story, and

M. E. gave her a statement naming Raicus and Scharfstein as the ones who performed the abortion on her on April 22.

*As to P. L.* (first three counts of Indictment No. 1088/64): As a result of intercepted telephone communications between Scharfstein and Moiel and Scharfstein and P. L.'s sister (Mrs. G.), Policewoman Merkel and another policewoman were staked-out in the vicinity of Mrs. G's home on April 15, 1964, at 9 A.M. and saw Scharfstein and Raicus arrive in Scharfstein's car. Scharfstein took a parcel from the trunk of the car and both entered and a few minutes after 10:00 Scharfstein and Raicus came out and departed. She learned P. L.'s name when she and her partner went to Howard Beach shortly prior to May 19 and spoke to Mrs. G. On May 19 she called P. L. on the telephone, told P. L. that they had reason to believe that she could help in an investigation being conducted by the District Attorney's office and asked her to come to that office in connection with that investigation, but she did not tell her what the subject of the investigation was. P. L. then came to the District Attorney's office with an attorney and certain stated information was elicited from her.

*As to A. M.* (last three counts of Indictment No. 1088/64): Informed by other police officers that they learned from a wiretap that Raicus and Scharfstein would be at A. M.'s home on the following morning. Policewoman Merkel and another policewoman were staked-out there on April 17, 1964. About 10:40 A.M. Raicus and Scharfstein arrived.

### THE LAW

Defendants contend that the names and identity of the aborted women having been obtained by the interception of telephone conversations under the invalid wiretap orders, the testimony given by them is the "fruit of a poisonous tree"; that it must be suppressed as illegally obtained evidence, and that the indictments resting thereon must be dismissed.

Despite general statements to the contrary, not all leads to evidence which come to light because of some antecedent illegal act by law-enforcement officials is legally suppressible under the poisonous tree doctrine. The mere fact that there may be a nexus between the evidence obtained as a result of such leads and the unlawful search and seizure, or intercepted telephone conversation, or other similar act, does not as of course necessarily condemn the evidence ultimately obtained as tainted and unusable.

The doctrine of the fruit of the poisonous tree was first expounded in *Silverthorne Lbr. Co.* v. *United States* (251 U. S.

385). In that case, after the court ordered the return of books and papers unlawfully seized by government officers, the government made photographs and copies of some of the material papers and sought to use such copies and photographs at the trial. Answering the contention of the government that the protection of the Fourth Amendment "covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act", the late Mr. Justice HOLMES said (p. 392). "In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. 232 U. S. 393. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court, but that it shall not be used at all. *Of course this does not mean that the facts thus obtained become sacred and inaccessible.* If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." (Emphasis supplied.)

Thereafter, in *Nardone* v. *United States* (308 U. S. 338) the poisonous tree doctrine, as well as the postulate that the facts unlawfully obtained do not necessarily "become sacred and inaccessible," was made applicable to evidence obtained by the interception of telephone communications interdicted by the Federal Communications Act (U. S. Code, tit. 47, § 605). In that case, in a new trial had after a reversal by reason of the use of unlawfully intercepted telephone messages (*Nardone* v. *United States,* 302 U. S. 379), the Trial Judge refused to allow the defendant to examine the prosecution as to the use to which it had put the information which the Supreme Court held vitiated the original conviction. The Supreme Court held, on the basis of its holding in *Silverthorne,* that not only the condemned evidence but what is obtained from it may not be used. However, the court introduced a "good sense" limitation on the extent to which this doctrine is applicable when it said (p. 341): "Here, as in the *Silverthorne* case, the facts improperly obtained do not ' become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it ' simply because it is used derivatively. 251 U. S. 385, 392.

"In practice this generalized statement may conceal concrete complexities. Sophisticated argument may prove a causal connection between information obtained through illicit wire-tap-

ping and the Government's proof. *As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint."* (Emphasis supplied.)

This question of remoteness or attenuation was again considered in *Wong Sun* v. *United States* (371 U. S. 471). In that case Federal agents made an unlawful search of premises occupied by one Toy. Charged with selling narcotics, Toy denied the accusation but said he knew one Yee who did and he gave the agents Yee's address. The agents went to the address and bought some heroin from Yee. Questioned by the agents, Yee stated that the heroin had been brought to him by Toy and another Chinese, whom Toy identified as Wong Sun. Toy then went with the agents to the neighborhood where Wong Sun lived and pointed out the latter's house. Wong Sun was thereupon arrested. Upon the premise that the entry into Toy's laundry and his arrest were unlawful and that, therefore, any oral statements made by him as a result thereof were fruit of the unlawful arrest and had to be suppressed, the court was required to consider and pass upon " whether the exclusion of Toy's declarations requires also the exclusion of the narcotics taken from Yee, to which those declarations led the police ". It stated (pp. 487–488, 491–492):

" The prosecutor candidly told the trial court that 'we wouldn't have found those drugs except that Mr. Toy helped us to.' Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence ' from an independent source,' *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has ' become so attenuated as to dissipate the taint.' *Nardone* v. *United States,* 308 U. S. 338 * * *. We need not hold that all evidence is ' fruit of the poisonous tree ' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is ' whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were ' come at by the exploitation of that illegality ' and hence that they may not be used against Toy. * * *

" We must then consider the admissibility of the narcotics surrendered by Yee. Our holding, *supra,* that this ounce of

heroin was inadmissible against Toy does not compel a like result with respect to Wong Sun. The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. Cf. *Goldstein* v. *United States,* 316 U. S. 114.''

Thus in determining whether to apply an exclusionary rule by reason of unlawful conduct by police, '' courts must in appropriate cases scrutinize the causal relationships involved to determine whether the evidence resulted from ' exploitation ' of the ' primary illegality '.'' (*Edwards* v. *United States,* 330 F. 2d 849, 851.) In such cases, the question is, as posed in the last-cited case, was the evidence sufficiently divorced from the unlawful act to '' dissipate the taint '' and permit the use thereof.

The only case that I have been able to find where suppression was ordered of testimony given by a witness whose identity was discovered through an unlawful wiretap is *United States* v. *Tane* (329 F. 2d 848). The *ratio decidendi* of that decision is that the information from the witness and his testimony were obtained by direct exploitation of the original illegality so that the '' primary taint '' continued and persisted.

It is fairly inferable from the opinion of the court that if the witness whose identity was learned from the intercepted telephone conversation had been questioned and his testimony obtained without the '' exploitation '' of the primary illegality, the testimony would not have been suppressed. The court, in discussing the fruit of the poisonous tree doctrine, specifically alluded to the fact that '' Pase [the witness whose identity was learned over the wiretap] was unwilling to testify or even admit to making any unlawful payments until possession of the wiretap of the December 6 conversation was revealed by the Assistant District Attorney ''. In holding that the government '' failed to carry its burden of showing that the information gained from the wiretap did not lead, directly or indirectly, to the discovery of Pase *and to Pase's willingness to testify* '', the court emphasized the latter point when it said that '' the record demonstrates that the identity of Pase and knowledge of his implication in unlawful payments was derived from the wiretap, *and that Pase was unwilling to testify or even admit to making any unlawful payments until he was told by the Assistant District Attorney that the December 6 conversation between his attorney and union officials had been tapped* ''. (p. 853; emphasis supplied).

*Smith* v. *United States* (324 F. 2d 879) presents a situation somewhat analogous to the one here. In a confession which was not admissible in evidence against him because it had been obtained after an unlawful detention, a defendant revealed the identity of a participant in the crime who thereafter testified for the prosecution. It was argued that '' because the confessions made during the ' unnecessary delay ' are inadmissible, the testimony of an eyewitness to the crime must also be suppressed because the existence of the eyewitness was revealed to police by appellants during the same period of time '' (p. 879). Rejecting this contention the court said (pp. 881–882):

'' *Courts have gone a long way in suppressing evidence but no case as yet has held that a jury should be denied the testimony of an eyewitness to a crime because of the circumstances in which his existence and identity was learned.* However, in our view, the relationship between the inadmissible confessions and Holman's testimony in the District Court months later is so attenuated that there is no rational basis for excluding it. No case has been cited to us in which the testimony of an eyewitness or factual witness has been excluded because his identity was discovered as a result of disclosures made by an accused during detention violative of Rule 5(a) Fed. R. Crim. P. * * *

'' The District Judge correctly read this court's holding in Killough v. United States, 114 U. S. App. D. C. 305, 315 F. 2d 241 (1962), as not requiring the exclusion of Holman's testimony. Neither the Killough holding, the Mallory holding nor any other case would warrant excluding Holman's testimony. The fact that the *source* of evidence is ' tainted ' by violation of constitutional or statutory provisions has not precluded the use of that evidence in every circumstance. [Citing cases.]

'' Here no confessions or utterances of the appellants were used against them; tangible evidence obtained from appellants, such as the victim's watch, was suppressed along with the confessions. *But a witness is not an inanimate object which like contraband narcotics, a pistol or stolen goods, ' speak for themselves.'* The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. *The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.*'' (Emphasis supplied.)

## CONCLUSION

The vindication of the constitutional rights of a defendant and the application of common sense to a given situation are not mutually exclusive. If the bad part of an apple can be cut away without destroying the apple, the remaining good part may still be used. Though the intercepted information here was used to learn the identity of the witnesses, the information, in a legal sense, was not "exploited" for the witnesses (the women aborted) gave their statements and subsequent testimony voluntarily. The wiretaps were not used to coerce them into testifying. Under such circumstances, the testimony of a witness may not be equated with a tangible object. It is the same as if by a trespass the police saw a defendant committing a crime in his home, and at the same time saw someone else therein witnessing its commission. Would it be held to be an invasion of the defendant's constitutional rights, *warranting a suppression,* if the witness were followed and asked and told what he witnessed in the home? The answer seems obvious. The situation here, legally, would seem to be on all fours. The motions are in all respects denied.