### PEOPLE *v.* TUCKER

1. CONSTITUTIONAL LAW—FOURTH AMENDMENT—EVIDENCE—ILLEGAL ACQUISITION—USE.

   The essence of the Fourth Amendment to the United States Constitution, which forbids the acquisition of evidence in a certain way, requires that illegally acquired evidence not only shall not be used in court, but also that it shall not be used at all.

2. EVIDENCE—EXCLUSIONARY RULE.

   The federal "exclusionary rule", forbidding the use of illegally acquired evidence, extends to verbal statements as well as to tangible materials.

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence §§ 410–412.
[2] 29 Am Jur 2d, Evidence § 414.
[3] 29 Am Jur 2d, Evidence § 416.
[4] 29 Am Jur 2d, Evidence §§ 416, 440.
[5] 29 Am Jur 2d, Evidence §§ 415, 531.
[6] 5 Am Jur 2d, Arrest § 1.
[7] 29 Am Jur 2d, Evidence §§ 249, 259, 288, 298.
[8] 30 Am Jur 2d, Evidence § 1140 *et seq.*

3. EVIDENCE—WITNESSES—IDENTITY—EXCLUSION.

> That the identity of a witness was learned by illegal means is insufficient to warrant exclusion of that witness's testimony, inasmuch as mere knowledge of that witness's identity does not guarantee that his testimony would be favorable to the prosecution; the court should weigh all the relevant factors including the possibility that the witness might have voluntarily contacted police even without their knowing his identity and the fact that his testimony has remained unchanged from the start.

4. CRIMINAL LAW—EVIDENCE—WITNESSES—ALIBI—ADMISSIBILITY.

> The testimony of an alibi witness whose name was given to police by defendant was admissible where the police officers were fulfilling their duty towards defendant in checking his alibi since it could be expected that the alibi witness's testimony would be favorable to the defendant, whose in-custody interrogation was within the guidelines set by the United States Supreme Court as expressed up to that time.

5. CRIMINAL LAW—EVIDENCE—"FRUIT OF THE POISONOUS TREE"—PURPOSE.

> One purpose of the rule excluding "fruit of the poisonous tree" is to deter unlawful police conduct but no such deterrent effect could be obtained by extending the rule to the case of one accused of rape where his custodial interrogation about that crime complied with the United States Supreme Court guidelines as expressed up to that time.

6. CRIMINAL LAW—SUSPECT—DETENTION—EXAMINATION—DRIVER'S LICENSE—ARREST.

> Police officer's action in stopping defendant to examine his driver's license after being advised of the name of a person wanted for questioning in a rape and make of an auto being driven by him was not an arrest, there being no intent by the officer to take defendant into custody until after the officer had learned the defendant's name from his license.

7. CRIMINAL LAW—WITNESSES—TESTIMONY—IDENTIFICATION—JURY—WEIGHT.

> Witness's identification of a dog that he had seen in the home of a rape victim as being the same dog later identified as belonging to the defendant charged with the rape was based on an original observation and was admissible, the weight to be given to the testimony being for the jury.

8. Criminal Law—Rape—Corpus Delicti—Testimony—Victim—
Physician.

> The *corpus delicti* in forcible rape cases is usually established
> by the victim's testimony but where the victim is unable to
> remember what happened, a physician's testimony that the
> victim's hymen had been ruptured within hours of his examina-
> tion and that sperm were present in her vagina, plus the fact
> that she was discovered tied, gagged, beaten and incoherent,
> will establish the *corpus delicti* (MCLA § 750.520).

Appeal from Oakland, Clark J. Adams, J. Sub-
mitted Division 2 May 9, 1969, at Lansing. (Docket
No. 5,019.) Decided October 1, 1969. Application
for leave to appeal filed December 17, 1969.

Thomas Wayne Tucker was convicted of rape. De-
fendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Thomas G. Plunkett,*
Prosecuting Attorney, and *Dennis Donohue,* Chief
Appellate Counsel, for the people.

*Bratton, Vander Kloot & Young,* for defendant.

Before: Lesinski, C. J., and Danhof and Quinn,
JJ.

Danhof, J. The first trial of defendant ended in
a mistrial for reasons not presently relevant. The
second trial resulted in a jury conviction of rape[1] and
a sentence on November 9, 1966, of 20 to 40 years im-
prisonment. The defendant has brought this appeal
alleging 8 errors of law which will be discussed
*seriatim* following a recapitulation of the essential
facts.

On April 19, 1966, the victim did not report for
work and a male co-worker and friend, Luther E.

---

[1] MCLA § 750.520 (Stat Ann 1954 Rev § 28.788).

White, telephoned her home to ascertain the reason for her absence. Receiving no answer, he went to her home in Pontiac township and discovered the victim tied, gagged, and brutally and bloodily beaten. She was partially disrobed and incoherent. The house was in a general and bloody disarray. The victim was 43, had never been married, and lived alone. Neither then nor later could she recall what had happened to her, nor could she identify the defendant.

A dog was in the home at the time Mr. White entered, although, to his recollection, the victim owned no dog. He testified that the dog later got out of the house. Shortly thereafter White was reporting the above facts to an Oakland county sheriff's deputy at the scene when he saw the same dog. The deputy followed the dog to a home, approximately 900 feet away on a zig zag course, where the dog sat down in the front yard. Finding no one at home, the deputy checked with a neighbor who told him that the defendant and his relatives lived at the house and that the dog belonged to them, and that defendant drove a red 1959 Ford. The deputy telephoned his information to the sheriff's department about noon.

At 4 p.m. that day Officer Lindberg of the Pontiac police department telephoned the Oakland county sheriff's department and learned of the crime from an unnamed person, and that a certain named suspect was driving a red 1959 Ford. At approximately 9 p.m. the same day, Officer Lindberg saw a red 1959 Ford automobile leaving the city and entering Pontiac township. The officer had no knowledge of defendant's physical description and had not observed any traffic violation, but he ordered the car to stop and demanded the driver's license of the operator, who was the defendant. The officer noted that the

last name on the license was the same as that given him by the sheriff's department, but that the first and middle names were reversed. The defendant was taken to the sheriff's department where scratches were observed on his face and blood on his clothes, including his underclothing.

Defendant was advised of his right to remain silent and related matters, but he was not advised that he had a right to a court-appointed attorney if he was too poor to afford one himself. He was interrogated and said that at the time the crime was committed he was with Robert Henderson. When contacted, Henderson stated that the defendant was not with him at the time defendant claimed and that defendant's scratched face was not from a goose that Henderson and defendant had shot, as defendant claimed, since defendant already had these scratches on his arrival at Henderson's. Additionally, Henderson stated that he had asked the defendant if he had "got hold of a wild one," and defendant responded that it was a "widow woman, or something like that" about in her thirties, who lived the next block over.

The existence of the scratches on defendant's face was corroborated by his work foreman to whom he had said, as he did to the police, that they were from the flailing of a goose.

A staff physician at Pontiac General Hospital determined that the victim needed extensive sutures in her vaginal area, that sperm was present inside her vagina, and that she had a recently ruptured hymen.

Defendant has been represented at the trial and on appeal by able court-appointed counsel.

The issues raised and our resolution of them follow:

1. *May testimony of a prosecution witness be taken where the identity of that witness was discovered solely through an interrogation of the defendant*

*which did not meet the standards of the United States Supreme Court case of* Miranda *v.* Arizona?

At the time of defendant's interrogation on April 19, 1966, he was advised of his rights as delineated by *Escobedo* v. *Illinois* (1964), 378 US 478 (84 S Ct 1758, 12 L Ed 2d 977). Defendant did not request the presence of an attorney during his interrogation, and no claim is made that his rights under *Escobedo* were violated.

Almost two months *after* defendant was questioned, the United States Supreme Court decided, on June 13, 1966, in *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974), that any statements of a defendant obtained during custodial interrogation would be excluded from evidence at trials unless certain warnings or information had been given prior to the interrogation, including the information that the defendant was entitled to a court-appointed attorney if he could not afford to hire a lawyer.

One week after *Miranda* was decided, the case of *Johnson* v. *New Jersey* (1966), 384 US 719 (86 S Ct 1772, 16 L Ed 2d 882), held that *Miranda* would apply only to trials commenced after the decisional date of *Miranda,* June 13, 1966. Since defendant Tucker's trial began on October 18, 1966, the *Miranda* decision applied to his trial and accordingly *the statements that the defendant made during the interrogation were excluded from evidence at his trial.*

We are now presented with the question of whether the exclusionary rule enunciated in *Miranda, supra,* should be extended to include the application of the "fruit of the poisonous tree" doctrine to evidentiary leads obtained from interrogations which were apparently legal at the time of their occurrence, but nevertheless fall into that limbo created by *Johnson, supra,* due to the fact that such interrogations oc-

curred before the decisional date of *Miranda,* but involved cases that went to trial after the decisional date of *Miranda.*

The earliest application of the "fruit of the poisonous tree" doctrine listed in 8 Wigmore, Evidence (McNaughton Revision 1961), § 2184a, p 40, was in *Silverthorne Lumber Company, Inc.* v. *United States* (1920), 251 US 385 (40 S Ct 182, 64 L Ed 319). The case concerned an illegal seizure of books, papers, and documents, portions of which federal agents photographed before returning. Justice Holmes, writing for the court, said:

"The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act. *Weeks* v. *United States* (1914), 232 US 383 (34 S Ct 341, 58 L Ed 652, LRA 1915B 834, Ann Cas 1915C, 1117) to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. 232 US 393. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all."

In another leading case, *Wong Sun* v. *United States* (1963), 371 US 471 (83 S Ct 407, 9 L Ed 2d 441), the exclusionary rule expressed in *Silverthorne, supra,* was extended to verbal statements as well as

to tangible materials, the court finding no logical distinction between the two for the purpose of deterring illegal search and seizure by law enforcement personnel.

The Federal Court of Appeals for the District of Columbia has set forth guidelines applicable to our case in *McLindon* v. *United States* (1964), 117 App DC 283 (329 F2d 238), as follows:

"In each case the court must determine how great a part the particular manifestation of 'individual human personality' played in the ultimate receipt of the testimony in question. Indications in the record that mere knowledge of the witness' identity would not inevitably guarantee that his testimony would be favorable to the prosecution; that the witness might eventually have voluntarily gone to the police even without their knowing his identity; that his testimony has remained unchanged from the start—all are relevant factors to be considered in determining the final outcome."

The defendant urges us that the rule to be applied in our case is the rule applied in *People* v. *Peacock* (1968), 29 App Div 2d 762 (287 NYS2d 166, 167, 168):

"Defendant was tried on July 13, 1966, subsequent to the decision in *Miranda* * * * and hence his inculpatory statements, made without the warnings which *Miranda* requires, were inadmissible in evidence. * * * In point of fact, defendant's statements were not used against him at the trial. He urges, however, that absent his statements the owner of the property (who testified at the trial) would not have been known and the identification of the articles seized could not have been made. In short, he argues that the proof against him at the trial was the tainted fruits (*sic*) of the illegally obtained statements.

"If, indeed, defendant's admissions were the source of the proof against him, we would hold, consistent

with the *rationale* in the cases relating to the use of evidence proceeding from an illegal search and seizure, that the fruits of the unlawful conduct in eliciting the admissions without the mandated warnings were equally excluded (citations omitted)."

*Peacock* is not controlling on this Court and we chose not to follow it. We find the dissenting opinion in *Peacock* more persuasive than the majority one. We quote with approval from that dissenting opinion:

"In any event, we are of the opinion that the 'fruit of the poisonous tree' doctrine should not be strained so as to extend its exclusionary rule to a complaining witness such as the one at bar who, in the ordinary course of events, could be expected to have come forward voluntarily to report the burglary at her home independently of any police investigation allegedly precipitated by defendant's inculpatory illegally obtained admissions and without being prodded into doing so as might conceivably be necessary in the case of a recalcitrant witness who is not a victim of the crime [cf. *Smith* v. *United States* (1965), 120 App DC 160 (344 F2d 545, 547); *McLindon* v. *United States* (1964), 117 App DC 283 (329 F2d 238, 241, n. 2); *United States* v. *Tane* (CA2, 1964), 329 F2d 848, 853]. It is our view that to extend the exclusionary rule to the testimony of such complainant would tend to undermine the doctrine's primary design to protect the innocent and relegate it to the less commendable function of providing technical loopholes for the benefit of the guilty. To subscribe to this would be to discourage and frustrate thorough and expeditious investigations, lest the authorities find themselves the victims of their own efficiency."

Furthermore, in *People* v. *Dannic* (1968), 30 App Div 2d 679 (292 NYS2d 257), four of the five judges who sat in *Peacock, supra,* said:

"In our opinion, assuming an illegal confession, for the fruit of the poisoned tree doctrine to be operative, a causal chain must be shown to exist from the primary illegality to the procurement of and the effect upon the substance of the evidence sought to be employed. A bare finding that the identity of witnesses was learned by illegal means is insufficient to warrant exclusion [cf. *Wong Sun* v. *United States* (1963), 371 US 471 (83 S Ct 407, 9 L Ed 2d 441); *People* v. *Rodriguez* (1962), 11 NY2d 279 (229 NYS 2d 353, 183 NE2d 651); *Smith* v. *United States* (1963), 117 App DC 1, (324 F2d 879); *McLindon* v. *United States* (1964), 117 App DC 283 (329 F2d 238); *United States* v. *Tane* (CA2, 1964), 329 F2d 848; *Smith* v. *United States* (1965), 120 App DC 160 (344 F2d 545); *People* v. *Scharfstein* (1967), 52 Misc 2d 976 (277 NYS2d 516)].

"Before determining the instant motion to suppress, several questions should have been answered: (1) if it be assumed that no statement had been made by defendant to the police, would Cather and O'Connor have come forward voluntarily; (2) if not, would the police have reasonably been expected to learn their identity by an independent investigation; and (3) apart from revealing their identity, to what use, if any, was the illegally obtained information put in procuring the testimony of the witnesses and in affecting the substance thereof."

Defendant's reliance on *Harrison* v. *United States* (1968), 392 US 219 (88 S Ct 2008, 20 L Ed 2d 1047), is misplaced. The court held that testimony by the defendant at a prior trial was inadmissible upon retrial because it was probably given to overcome the impact of confessions illegally obtained and introduced into evidence, and was tainted by the same illegality that rendered the confessions themselves inadmissible. The Supreme Court specifically re-

served decision on the type of case before this Court, saying in footnote 9:

"We have no occasion in this case to canvass the complex and varied problems that arise when the trial testimony of a witness other than the accused is challenged as 'the evidentiary product of the poisoned tree'."

None of the cases reviewed present precisely the same fact situation involved in the case before us.[2] We specifically note that witness Henderson was contacted initially by law enforcement authorities as an alibi witness on behalf of the defendant. Had he supported the defendant's statement that he was scratched by the flailings of a goose, defendant might never have stood trial for the crime of which he has been convicted. Furthermore, could anyone think that the officers had fulfilled their duty towards defendant, had they chosen not to check out his alibi?

One purpose of the rule excluding "fruit of the poisonous tree" is to deter unlawful conduct by police. No such deterrent effect could be obtained by extending the doctrine to the defendant's case wherein the custodial interrogation complied with United States Supreme Court guidelines as expressed up to that time.

Additionally, witness Henderson, not being a participant in the crime, might well have come forward voluntarily with his testimony, and certainly there was no inevitable guarantee that his testimony would be favorable to the prosecution. In fact, as a proffered alibi witness, quite the opposite was to be expected. We have considered the guidelines

---

[2] An exception to the "fruit of the poisonous tree" doctrine has been recognized when knowledge of the tainted information was gained from an independent source, *Silverthorne, supra,* cited in *Wong Sun* v. *United States, supra.* This exception has no application to the facts of the present case.

quoted from *McLindon, supra,* and also those in *Dannic, supra,* and we hold that the testimony of witness Henderson was admissible.

*Jenkins* v. *Delaware* (1969), 395 US 213 (89 S Ct 1677, 23 L Ed 2d 253), decided after the instant case was argued, held that *Miranda, supra,* did not apply to any retrial of a defendant whose first trial commenced prior to June 13, 1966.[3] Our decision not to extend the exclusionary rule stated in *Miranda, supra,* to witness Henderson's testimony is consistent with that case.

2. *Does the stopping of a motor vehicle by a police officer on duty and in uniform to examine the driver's license of the motor vehicle operator constitute an arrest of that operator?*

The defendant states in his reply brief that "The 'real issue' is to determine under what conditions a police officer may stop (arrest) the defendant to demand the license." There is an assumption in that statement that we are not willing to make, namely, that stopping a driver to examine his driver's license is an arrest.[4] The cases cited by defendant relative to this issue are factually distinguishable, a number of them because they involve a stopping for a traffic violation and a subsequent seizure of evidence.

In the present case, Officer Lindberg did not stop defendant because of any traffic violation, but rather because he was looking for a man named Wayne Thomas Tucker, driving a red 1959 Ford, who was wanted for questioning about a rape. There was no intent to take the defendant into custody until

---

[3] Citing the *Jenkins* decision, the Michigan Supreme Court held in *People* v. *Woods* (1969), 382 Mich 128, 139 that *Miranda* does not apply to the retrial of a defendant whose first trial commenced prior to June 13, 1966.

[4] MCLA § 257.311 (Stat Ann 1968 Rev § 9.2011) requires the operator of a motor vehicle to have in his immediate possession a license which he shall display upon demand of any uniformed police officer.

after his driver's license was examined and his name thereby revealed.

We hold that such a stopping did not constitute an arrest.

3. *Does a police officer's telephone call to another police department, answered by some unrecalled person who volunteers that such department seeks in connection with a specific crime, a named, but undescribed suspect, unknown to the officer, driving a vehicle of unknown license, specific make, year and color, constitute probable cause for the officer to arrest a driver of a car so modeled, dated and colored, but not otherwise suspicious, observed five hours later in a different, adjoining and populous municipality at least twelve hours after the alleged crime was committed?*

Our resolution of question 2 makes it unnecessary to rule on this issue.

4. *Is a layman's testimony that a certain dog he observed at one time is the same as a dog observed at a later time a conclusion or opinion which would require, if admissible at all, that the witness first set forth all facts on which he bases such conclusion or opinion?*

Witness White was unequivocal in his identification of the dog in the yard as the same as the dog that was in the victim's house when he arrived. Defendant objected to the admission of this testimony as a conclusion or opinion of the witness not based on supporting facts. However, according to 7 Wigmore, Evidence (3d ed), § 1977:

"The opinion rule has been used as a bludgeon against every conceivable sort of testimony, even against such simple statements as estimates of *distance, time, size, identity,* and the like. Fortunately, however, such attempts have been usually unsuccessful in that class of cases."

In *People* v. *Quigley* (1921), 217 Mich 213, it was claimed that there was no competent evidence identifying defendants as the persons who committed the robbery. There was testimony that the defendants had the "general appearance" of the persons who committed the robbery. The Court stated, p 222:

"There was other testimony of about the same general tenor. Such testimony was competent, and the weight to be given it was a question for the jury in view of all the other circumstances and the evidence in the case."

A similar result was reached in *People* v. *Greeson* (1925), 230 Mich 124. We hold that witness White's unequivocal testimony regarding identification of the dog based on original observation was admissible and that the weight to be given it, as affected by the defendant's cross-examination, was a matter for the jury.

5. *Did the witness Patricia Ann Bradley demonstrate sufficient knowledge to be able to testify that the dog referred to in question 4 belonged to the Tuckers?*

Witness Bradley testified that she had lived across the street from defendant for 9 years, had seen defendant about once a week, that the dog belonged to the Tuckers, and that it was inclined to follow members of the Tucker family.

There is no merit in the contention that her testimony was inadmissible.

The citation of cases relative to the admissibility of evidence of dog tracking have no relevance to the facts of this case.

6. *Assuming,* arguendo, *that the testimony objected to in questions 4 and 5 is otherwise admissible; should such testimony nevertheless have been*

*excluded because it is an impermissible inference to conclude therefrom that the dog followed this defendant-appellant to the victim at the place and time of the offense charged?*

Defendant argued that testimony relative to the dog was inadmissible because an inference cannot be drawn upon an inference.

Such argument fails because only one inference is involved; namely, from the factual testimony that defendant's dog sometimes followed him and was in the victim's house, the jury could infer that it had followed him there.

The testimony by witnesses White and Bradley relative to the dog was admissible for the jury to consider in arriving at a verdict.

7. *Is a microscope slide allegedly showing sperm with testimony by the medical doctor who secured the alleged smear of sperm that such sperm was within the vagina of the alleged victim admissible in a rape case when the doctor further states that he would have no way of knowing whether sperm was on the slide before the test was taken although he testified over objection that the "procedure" was to use fresh slides for each such examination?*

The medical doctor testified that the slide was a "new slide, an unused slide," and "was taken from a container from the manufacturer." This was an adequate foundation for the admission of the slide and the doctor's testimony relative to it. Other considerations brought out by cross-examination went to the credibility of the evidence, not its admissibility.

The "chain of custody" cases cited by defendant are not pertinent to the facts of this case.

8. *Is testimony by the examining physician in a rape case that the victim had a perineal laceration*

*of the female genitalia on the outer surface of the
vagina with "penetration" rupturing of the hymenal
ring, which he concluded occurred within hours of
his examination, indicating "recent trauma," but that
he could not conclude what happened to the victim
except that she was "assaulted" (and this conclusion
was based in part on conversation with unrecalled
persons) sufficient to prove* corpus delicti *without
the victim's testimony?*

The *corpus delicti* in forcible rape cases is usually
readily established by testimony of the victim. That
is not true here, however, as the victim could not
remember what happened.

Nevertheless, the testimony of the examining doc-
tor that the victim's hymen had been ruptured with-
in hours of his examination and that there was
sperm present within the victim's vagina, coupled
with the fact that the victim was discovered tied,
gagged, horribly beaten, and incoherent, leaves no
doubt that the *corpus delicti* was established.

The defendant has had a fair trial and his convic-
tion is affirmed.

All concurred.