David 0. Boehm, J.
Defendants were previously convicted of the crimes of assault, second degree, with intent to commit rape; assault, second degree, with intent to commit sodomy; sodomy, first degree and attempted rape, first degree. By decision dated January 13, 1969, the Court of Appeals reversed the judgments of conviction of both defendants and ordered a new trial (23 N Y 2d 429).
*1085 Defendant Christman now brings this motion prior to trial for an order:
(A) Declaring illegal the searches made of his 1965 Sting-Ray Corvette Chevrolet automobile;
(B) Declaring illegal the seizure thereafter made of said defendant’s automobile, a blanket found therein, any fingerprints found therein, any photographs of said automobile, and any other property found therein;
(0) Suppressing from use in evidence of said automobile, the blanket and other property found therein, fingerprints and photographs of said automobile.
In its decision, the Court of Appeals held in part: ‘ ‘ The seizure of 'Christman’s car and its inspection were likewise improper though, it should be noted, the evidence educed therefrom did not adversely affect or prejudice either defendant. No fingerprints or other evidence was found in the car. The blanket found there and received in evidence was not connected with the crime and itself had no probative force. ” (23 N Y 2d 429, 433.)
The People concede that this language requires, directly or implicitly, the granting of defendant’s entire motion except as it deals with the photographs of defendant’s car which were taken while it was in police custody. In order to avoid prejudicing defendant, the People have agreed to suppress all photographs which indicate in any way that the car was in the possession of the police when the pictures were taken. This stipulation covers all of the photographs but one, a rear view shot showing clearly the license plate bearing New York license number 1709 WN. Except for the fact that the photograph indicates that the car was then in the interior of some building, there is nothing in it which would show what building it is. Although the location of the car at that time was the police garage in the Public Safety Building in Rochester, as far as the photograph itself is concerned, the setting could be any garage or any building.
The question' before the court is whether this photograph, admittedly taken during a period of unlawful detention, must be suppressed.
The defendant’s position is that the police were not. authorized by him to examine or take his automobile and taking and holding the car in the police garage was violative of his constitutional rights; therefore, any evidence obtained, such as the photograph in question, at that time and place, must be barred, citing Silverthorne Lbr. Co. v. United States (251 U. S. 385).
A hearing was ordered to more fully reveal the circumstances *1086 on the day the defendant’s automobile was towed by the police from the defendant’s home to the police garage. The facts brought out at the hearing make it clear that the photograph is not a “fruit of the poisonous tree ” in the Silverthorne sense. It is not “ knowledge ” which, but for an unlawful search and seizure, the police would not have had; nor is it evidence which derived solely therefrom or which came to light only as a result of an originally wrongful trespass.
The defendant on May 22, 1965 lived with his parents on Inglewood Drive in the City of Rochester, New York. The house is located on the north side of Inglewood Drive. There is a driveway immediately to the east of the house, running from Inglewood Drive northerly to the rear of the lot up to a detached garage located on the northeast corner of the property. The driveway is straight and fairly level, rising slightly from the street grade to the garage. The lot is 30 feet wide and extends back 130 feet from the north line of the sidewalk to the rear lot line. The rear of the garage is on the rear lot line and, from front to rear, is approximately 20 feet long. There is a distance of approximately 40 feet from the front of the garage to the rear of the house. The house is set back a distance of 90 feet from the north curb of the street and 60 feet from the north line of the sidewalk. The driveway is approximately 9 feet wide.
In the morning of May 22, 1965, the Rochester police were investigating a complaint involving charges which were subsequently brought against the defendant. An automobile was directly connected with and involved in the criminal conduct.
That afternoon, about 3:30 p.m., in the course of their investigation, the police drove to the defendant’s home on Inglewood Drive and pulled into the driveway. The weather was clear and the visibility excellent. On their arrival, they observed the defendant’s automobile, a 1965 Chevrolet Corvette, parked in the driveway in front of the east bay of the garage, facing north, with its rear facing south toward the street. There were no other vehicles in the driveway at the time and the police had a clear, unimpeded view to the defendant’s car, the back end of which was between 75 to 85 feet from the north curb of Inglewood Drive. The police parked their vehicle a short distance behind the defendant’s car but were able to read its license number even before they entered the area of the curtilage.
Earlier that day, the police had spoken to the complainant and obtained from her a license number which compared to the license number they observed on defendant’s car. From a license check, also conducted earlier, the police had already *1087 ascertained that a car with that license number was registered to the defendant.
At the defendant’s home the police spoke to defendant and his mother and on their departure took the defendant with them, although they did not place him under arrest just then. When they left the defendant’s home, his car was still in the same place where it had been on their arrival.
Later that day, a police tow truck was dispatched to bring the defendant’s car to the police garage. At that time there were at least two other cars in the driveway behind defendant’s vehicle. However, these had arrived after the defendant was taken into police custody.
The People introduced evidence, which was uncontroverted, by a police photographer that the camera then in use by the Rochester Police Department, a 4 by 5 Graflex using Tri-X film, could have clearly photographed the defendant’s vehicle as it was parked in the driveway that afternoon when the police first arrived; that it would have been able to get a negative and a print from such negative; that such print would have reproduced a legible license number and the distinguishable characteristics of the defendant’s vehicle, particularly the rear portion thereof. The witness testified that such a photograph could be taken from an even greater distance — as far as 500 feet away, and that a negative so obtained could be enlarged so as to preserve the distinguishable characteristics of the car and the numerals and letters of the license number. The People’s proof in this respect made it obvious that such a photograph, taken from the street or from the public sidewalk, would have fairly and accurately reproduced on film the automobile and license plate with its letters and numerals at least as, if not more, clearly as what would be observed by the naked eye from that position.
Regardless of the fact that a photograph was not actually taken at that time and place, it is nevertheless quite apparent that any such photograph would have disclosed the same information as the photograph taken in the police garage. Were this a photograph taken of the front end of the car, the court would have been obliged to take judicial notice of the fact that in 1965 vehicles registered in New York State bore only one license plate — and that on the rear. Consequently, a view or photograph from the street or sidewalk would not have disclosed any license identification were the front of the car facing the street. But that is not the situation here, because it was the rear of the car with the license plate affixed thereto that was, on May 22, 1965, openly visible to all visitors or passersby. It *1088 is obvious, therefore, that seeing what was there to be so seen violated no right of privacy which the defendant had.
This is the test which must be applied under Katz v. United States (389 U. S. 347) which emphasized that it is not the physical invasion of property which distinguishes a proper from an improper search or seizure, but rather the invasion of one’s reasonable expectation of privacy. (See, also, Chief Judge Trayitob.’s trenchant and scholarly opinion in People v. Thayer, 63 Cal. 2d 635, which anticipated by several years both Katz and Warden v. Hayden, 387 U. S. 294.)
Here, as already noted, the automobile was in plain and open view to the neighbors, to the pedestrians and to the police. One neighbor testified she could see it from her house. ■ It can hardly be argued that one’s privacy is invaded when one, by his own conduct, explicitly disclaims that right. Thus, if one grows marijuana in his yard, may a police officer snap a picture of it from the street? May he take a photograph of the same marijuana where, after seeing it, he goes on the land without the authority of a warrant, cuts the marijuana and brings it to the police station? May he retain the photograph as a permanent record of what his own eyes recorded before the trespass?
In Bradley v. State (6 Cr. L. 2180 [Cal.]) the court held that a defendant exhibited no reasonable expectation of privacy with regard to a keg converted into a marijuana-growing planter box located in his backyard. The marijuana growing in the planter obtained by police in a search based on less than probable cause was held to be admissible at trial, the majority pointing out that the backyard in which the marijuana plants were growing in open view was freely accessible to delivery men and others, thus tending to disprove any expectation of privacy on the part of the defendant.
Concededly, marijuana is contraband by law as were similar subjects of seizure in many other cases involving the exercise of the senses (Hodges v. United States, 243 F. 2d 281, [5th Cir., 1957]; Walker v. United States, 225 F. 2d 447, [5th Cir., 1955]; Arnold v. State, 153 Miss. 299; People v. Clifton, 169 Cal. App. 2d 617), whereas the automobile here could become contraband only by the use to which it had been put earlier that morning. But the police had, at the very least, probable cause to look at that particular automobile and license plate before they drove to the premises. Indeed, with knowledge they already possessed, this was precisely one of their purposes in going to the house on Inglewood Drive. Although the Court of Appeals held the seizure to be improper, one may reasonably *1089 surmise that if the ear were taken at the same time the defendant was placed in custody, the result may well have been otherwise.
As one court recently said: “ ‘ Search ’ implies a prying into hidden places for that which is concealed and it is not a search to observe that which is open to view. (People v. Exum, 382 Ill. 204, 210).” (People v. Rosenthal, 59 Misc 2d 565, 569-570.)
Any doubt as to the propriety of derivative evidence would seem to be best resolved by the manner in which the individual himself views the evidence in question, his u reasonable expectation of privacy ” under the circumstances of the given situation. Thus, in Silverthorne Lbr. Co. v. United States (251 U. S. 385, 392) Justice Holmes pointed out that there is an abiding and important distinction between the means used to obtain 1 ‘ knowledge ” of evidence and the use of the evidence so obtained, stating: “ The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government’s own wrong cannot be used by it in the way proposed.”
In Wong Sun v. United States (371 U. S. 471) the narcotics taken from Tee were excluded because the prosecutor candidly admitted that, but for the excluded declaration of Toy, the drugs would never have been found. The Supreme Court said (pp. 487-488): “ Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence 1 from an independent source, ’ Silverthorne Lumber Co. v. United States, 251 U. S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has 1 become so attenuated as to dissipate the taint ’. Nardone v. United States, 308 U. S. 338, 341. We need not hold that all evidence is ‘ fruit of the poisonous tree ’ simply because it would not have come to light but for the illegal actions of the police. Bather, the more apt question in such a case is 1 whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint ’. Maguire, Evidence of Guilt, 221 (1959).”
But the court, per Justice Brennan, went on to point out (pp. 491-492): “ We must then consider the admissibility of *1090 the narcotics surrendered by Yee. Our holding, supra, that this ounce of heroin was inadmissible against 'Toy does not compel a like result with respect to Wong Sun.* The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Tee. The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. Cf. Goldstein v. United States, 316 U. S. 114.”
The fact of the matter is, that even using the ‘ ‘ but for ’ ’ rule of Wong Sun, the identity, location and ownership of the automobile here would not be excluded for such knowledge was not derived from any illegality. As an example of this distinction, one court has held that where rustled cattle would have been located in due course in the Oklahoma City Stockyards, the testimony of the Stockyard employees who received them was admissible even though the police obtained a Stockyard document by unlawfully arresting the defendant. (Pfeifer v. State, 5 CrL 2155 [Okla. Ct. Crim. App., April 23, 1969]; see, also, People v. Scharfstein, 52 Misc 2d 976.)
In another case, the court permitted the admission of photographic evidence of blood on the interior and exterior of a vehicle, one of the grounds being that taking a picture of what the officers had seen at the time the car was first observed did not constitute an unlawful search and seizure. (Abrams v. State, 223 Ga. 216.) For other cases permitting analogous applications of the ‘ ‘ plain view ’ ’ rule, see: People v. Surrago (24 N Y 2d 934); People v. Brosnan (31 A D 2d 975); People v. Zum (N. Y. L. J., July 22, 1969, p. 11, col. 4); Harris v. United States (390 U. S. 234, 236); United States v. Myers (329 F. 2d 280 [3d Cir., 1964]); Reed v. Rhay, (323 F. 2d 498 [9th Cir., 1963]); McDaniel v. United States (154 F. Supp. 1, affd. 255 F. 2d 896, cert. den. 358 U. S. 853); People v. White (69 Cal. 2d 751); People v. Harris (67 Cal. 2d 866); State v. Chinn (231 Ore. 259); Goodman v. State (158 Miss. 269).
The court is aware of the recent U. S. Supreme Court decision in Davis v. Mississippi (394 U. S. 721), where it was held that the use of certain fingerprint evidence at trial required reversal of the judgment of conviction because the detention *1091 of the defendant, during which the fingerprints were taken, constituted an unreasonable seizure of his person in violation of the Fourth Amendment. However, Davis was seized in a dragnet arrest involving the detention or interrogation of over 70 suspects; he was confined and fingerprinted at a time when there was neither a warrant nor probable cause for his arrest. The fingerprints constituted 1‘ knowledge ’! which, but for the primary illegality, the police would not otherwise have obtained and it was this illegality which tainted all that followed. The Supreme Court gave no weight to the argument that the method should be overlooked because fingerprint evidence is trustworthy, declaring that, regardless of trustworthiness, the proscriptions of the Fourth and Fourteenth Amendments prohibited this kind of overreaching governmental conduct and all that followed therefrom. (But cf. Zap v. United States, 328 U. S. 624, 629-630.)
However, as Justice Stewart laid down in Katz v. United States (389 U. S. 347, 351-352) “ the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.” (See, also, Hoffa v. United States, 385 U. S. 293, 303; Smayda v. United States, 352 F. 2d 251 [9th Cir. 1966]).
As the Supreme Court emphasized, it was not “ the intruding eye — it was the uninvited ear ”, (id. p. 352), which the petitioner, by calling from a public telephone booth, sought to exclude. It would follow that if Katz, while calling, had kept the telephone booth door open and shouted into the telephone loudly enough for passersby to hear him, he would have no Fourth Amendment right to the ‘1 uninvited ear ’5 either.
The decision in the case at bar rests upon two grounds: (1) The “knowledge ” of the automobile was obtained by the police before, not as a result of, its seizure (knowledge of the facts having been ‘ ‘ gained from an independent source they may be proved like any others ”. (Silverthorne Lbr. Co. v. United States, 251 U. S. 385, 392; see, also, United States v. Paroutian, 319 F. 2d 661 [2d Cir., 1963], cert. den. 375 U. S. 981; United States v. Jackson, 387 F. 2d 115 [4th Cir., 1967]); (2) any right to privacy with respect to the automobile or the recorded exterior view thereof was effectively waived by the defendant.
Consequently, conceding that the police had no right to take the automobile to the garage where the photograph was taken, such taint as may have been created thereby is sufficiently *1092 attenuated as to permit the retention and use of the photograph by the People. (Wong Sun v. United States, 371 U. S. 471, 488; Nardone v. United States, 308 U. S. 338, 341.) Application denied.

 By whom it was sold, which Wong Sun admitted after his legal arrest and his valid interrogation. However, Wong Sun’s arrest followed directly as a result of the illegal arrest of Tee and Toy after their interrogation disclosed Wong Sun’s identity to the agents.