## CARTER *v.* STATE OF MARYLAND

[No. 51, September Term, 1974.]

*Decided April 11, 1975.*

412

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Francis X. Gaegler, Jr.,* for appellant.

*George A. Eichhorn, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

O'DONNELL, J., delivered the opinion of the Court.

Following a nonjury trial in the Circuit Court for Prince George's County before Judge James F. Couch, Jr., the petitioner, William Eugene Carter, was convicted of possession of heroin with intent to distribute in violation of Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 286 (a)(1).[1] Critical evidence, admitted at his trial, was 104.04 grams of heroin (34.6% pure) and 37.98 grams of starch (a cutting agent used in the distribution of heroin as a dilutent). These substances were seized on June 9, 1972, pursuant to a search and seizure warrant issued on June 8, 1972, by Judge Robert Mathias for the residence of the petitioner at apartment 926, 1836 Metzerott Road, Hyattsville, Maryland, a high rise apartment building of at least ten stories. Judge Mathias issued the warrant upon the application and affidavit of Detective Elmer L. Snow of the Prince George's County Police Department. Detective Snow, after specifying his police service, his specialized training in narcotics and his experience in investigating complaints of violations of the narcotic laws, attested to the following facts as bases for the issuance of the warrant:

> "That during the course of your affiant's official duties on March 3, 1972 your affiant was contacted *by a reliable confidential source of information.* That the said *confidential source of information is personally known to your affiant as reliable* in that *the said source* has furnished *information* to your affiant over a period of approximately two years which has been found to be *completely* true, and whose *information* has been the direct cause which led to the arrest and convictions of approximately ten persons who were convicted of violating the Controlled Dangerous Substance Laws of the State of Maryland. That the said *confidential source of information related* to your affiant that a

---

1. He was sentenced to a term of twenty (20) years dating from March 22, 1973, pursuant to Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 286 (b)(1).

Negro/Male known only to the source as Chunkhead was involved in obtaining large quantities of Heroin from one William Eugene CARTER, a Negro male who resides inside apartment 926 at 1836 Metzerott Road, Hyattsville, Maryland. That the *source of information* further *related* that the said William Eugene CARTER would only sell direct in transactions of Heroin to the said Chunkhead for fear of a police agent becoming involved. That the *said source* further *related* that the said William Eugene CARTER is known throughout drug dealers in Washington, D.C. as a major supplier of Heroin, and was known to keep large quantities of Heroin inside his apartment at 1836 Metzerott Road, Apartment 926, Hyattsville, Prince George's County, Maryland. That the *said source* further *related* to your affiant that as recently as March 2, 1972 the *source* had *personally gone with* the said Chunkhead from his home at 1222 Queen St. N.E., Washington, D.C. to 1836 Metzerott Road, Hyattsville, Maryland where the said Chunkhead departed the vehicle and stated that he was going inside the premises to obtain Heroin from "Carter". That after a short period of time, Chunkhead returned to the vehicle with an aluminum foil packet which the source personally used, and knew from his own drug use experience to be Heroin. That due to the evasive manner in which the said William Eugene CARTER allegedly conducts the illicit transactions of Heroin, your affiant has verified the *information received from the reliable confidential source of information* in the following manner:

On March 3, 1972 at 1900 hours your affiant, along with Lieutenant Hollis D. Jordan, Sergeant Joseph E. Thornberry, and Detective John A. Lew of the Prince George's County Police Department Vice Control Section began a surveilance [sic] on the premises at 1222 Queen Street, N.E., Washington, D.C. That at approximately 1930

hours these Detective's, [sic] and your affiant personally observed a 1970 yellow Chevrolet, bearing Maryland Registration EA 72:56 arrive at the premise. That inside the said vehicle, your affiant personally observed, and recognized the two occupants of the vehicle. They are: Don Pedro DANIEL, and Harold James GADDY. Both of these persons are known to your affiant as violators of the Controlled Dangerous Substance Laws of the State of Maryland. That your affiant has personally arrested both of these persons for violations of the Controlled Dangerous Substance Laws of the State of Maryland. That an unknown Negro Male later identified as "Chunkhead" was then observed leaving 1222 Queen Street, N.E., Washington, D.C. and entering the said 1970 Chevrolet operated by the said Don Pedro Daniel. That the three persons were then followed as they proceeded to 1836 Metzerott Road, Hyattsville, Prince George's County, Maryland where the vehicle parked in front of the said 1836 Metzerott Road, Hyattsville, Prince George's County, Maryland. That the Negro male known as Chunkhead then left the said vehicle at which time he was followed by Sergeant Joseph E. Thornberry, and Detective John A. Lew as he rode an apartment elevator to the ninth floor, where he knocked, and was admitted to apartment 926 at 1836 Metzerott Road, Hyattsville, Prince George's County, Maryland. That after approximately four minutes, "Chunkhead" departed the said premises, and returned to the vehicle operated by the said Don Pedro Daniel. That the vehicle was then followed as the three occupants returned to 1222 Queen St. N.E., Washington, D.C. where the subject known as Chunkhead left the vehicle, and went into 1222 Queen St. N.E., Washington, D.C. That surveilance [sic] at that time was stopped for fear of being observed.

That at 2345 hours on March 3, 1972 your affiant

made a records check with the Criminal Records Division of the Metropolitan Police Department of Washington, D.C. That a photograph of William Eugene CARTER, D.C. Identification #105-082 was obtained. That investigation at that time did reveal that the said William Eugene CARTER has been arrested for the following offenses: 2/18/42 — Automobile Larceny in Pikesville, Maryland, 11/9/46 — Murder in Washington, D.C., 2/10/47 — Manslaughter, 2/15/51 — Operating a Lottery, 8/9/68 — Possession of Stolen Government Property, 10/14/68 — Uttering United States treasury Checks, 9/11/69 — Uttering United States Treasury Checks, 8/26/71 — Operating a Lottery.

That on March 6, 1972 your affiant contacted a Mrs. Dunn who was the resident manager of the Presidential Towers Apartments at 1836 Metzerott Road, Hyattsville, Maryland. At that time, Mrs. Dunn identified D.C.I.D. Photograph of William Eugene CARTER as the same person residing in apartment 926 at 1836 Metzerott Rd., Hyattsville, Maryland. At that time it was found by your affiant that the said William Eugene CARTER was not carried on the lease of the said apartment, but was the person who usually paid the rent for the said apartment.

That on April 11, 1972 your affiant was contacted by Special Agents of the United States Department of Justice, Bureau of Narcotics, and Dangerous Drugs. That Special Agent SANTOS of that Agency related to your affiant that the said William Eugene CARTER is known by that agency to be an associate of one Norman SMITH and Alphonso JACKSON, two major narcotic violators in the Washington, D.C. Metropolitan area.

That at 1230 hours on April 11, 1972, your affiant *was telephonically contacted by the aforementioned confidential source of information* who related that the said William Eugene CARTER has started delievering [sic] Heroin to 1222 Queen St. N.E.

Washington, D.C. from his apartment at 1836 Metzerott Road, apartment 926, Hyattsville, Maryland because of fear of the said Chunkhead being followed to his residence where the drugs are maintained. That subsequent to the *information as received from the confidential source,* a surveilance [sic] was started at 1836 Metzerott Road, Hyattsville, Prince George's County, Maryland. That at 1400 hours on that date, a negro male, recognized by your affiant from M.P.D.C. Photo #105-082 departed the said premises in a 1965 Ford Station Wagon bearing D.C. registration plates 806-949. That a check with the Motor Vehicles Section of Washington, D.C. did reveal the said vehicle bearing District of Columbia Registration plates 806-949 to be listed to one William Eugene CARTER. That the said William Eugene CARTER proceeded to 1222 Queen St. N.E., Washington, D.C. where the said William Eugene CARTER went into the said premises, and the[n] departed.

That subsequent to the visit by the said William Eugene CARTER, and more specifically on April 11, 1972, Special Agent Albert C. LOGAN of the United States Department of Justice, Bureau of Narcotics and Dangerous Drugs did make a Heroin buy for $80.00 from a Negro male known to Agent LOGAN as "Chunkhead" while inside the premises at 1222 Queen St. N.E., Washington, D.C.

That on April 19, 1972 your affiant conducted a surveilance [sic] on the premises at 1836 Metzerott Road, Hyattsville, Prince George's County, Maryland. That at 2340 hours the said William Eugene CARTER departed the said premises in a black Lincoln bearing District of Columbia Registration plates 859-631. That a check by your affiant with the Department of Motor Vehicles of Washington, D.C. did reveal this vehicle to be listed to the said William Eugene CARTER. That the said William Eugene CARTER was followed by your affiant to 1222 Queen St. N.E., Washington, D.C. at

418

which time he parked the said vehicle and entered the front door of 1222 Queen St. N.E., Washington, D.C. at which time the said William Eugene CARTER remained for approximately five minutes, and departed. That the surveilance [sic] was discontinued at that time for fear that your affiant would be observed.

That on May 19, 1972 your affiant conducted a surveilance [sic] on the premises at 1836 Metzerott Road, Hyattsville, Prince George's County, Maryland which began at 0920 Hours. That at 0950 hours the said William Eugene CARTER did depart the premises in his black Lincoln bearing District of Columbia Registration plates 859-631. That the said William Eugene CARTER was followed by your affiant to 1222 Queen Street, N.E., Washington, D.C. at which time he did enter the said premise, remain for approximately four minutes, and depart.

That on June 3, 1972 your affiant conducted a surveilance [sic] on the premises at 1836 Metzerott Road, Hyattsville, Prince George's County, Maryland which began at 0810 hours. That at 0840 hours, the said William Eugene CARTER did depart the premises in his black Lincoln bearing District of Columbia Registration plates 859-631. That the said William Eugene CARTER was followed by your affiant to 1222 Queen St. N.E., Washington, D.C. at which time he did enter the said premises, remain for approximately ten minutes, and departed. Your affiant stopped surveilance [sic] at this time for fear of being observed by the said William Eugene CARTER.

That on June 8, 1972 your affiant was again contacted by the *said confidential source of information* who related that the said William Eugene CARTER was schedule[d] to make a large narcotics drop on the morning of June 9, 1972 at 1222 Queen St. N.E., Washington, D.C.

That from the information as received from *the*

*confidential source of information,* and which has been verified on numerous occasions by personal observations, and personal knowledge, your affiant feels that properties subject to search and seizure under the Controlled Dangerous Substance Laws of the State of Maryland are being concealed inside apartment 926 at 1836 Metzerott Road, Hyattsville, Prince George's County, Maryland, and that your affiant requests that a search warrant be issued on the aforementioned facts and affidavit." (Emphasis supplied.)

Pursuant to Maryland Rule 729 b 1, counsel for the petitioner filed a motion for the suppression of the property seized pursuant to the search and seizure warrant on the basis that it had "been obtained by an unlawful search and seizure." [2]

The motion, supplemented by an attached memorandum, alleged *inter alia* that the affidavit, made in application for the warrant, on its face failed to demonstrate the existence of probable cause and that the statements therein were untrue, incomplete and constituted a material misrepresentation to, and a deliberate deception of, the court.

When the motion came on for hearing before Judge Mathias — the same judge who had issued the warrant [3] — counsel for the petitioner explicated that the affidavit had failed to disclose to the court that information garnered during the investigation, as a basis for the affidavit, had been obtained through the employment by the police of illegal electronic surveillance and that the failure to disclose

---

**2.** Maryland Rule 729 h, encompasses within a "search and seizure" evidence obtained by "wire tapping or the use of any electronic device or other device or equipment referred to in Code, Article 35, Sections 92-99, inclusive [now Courts Article §§ 10-401 through 10-408] and Article 27, Sections 125-A-C, and "property" encompasses "records, tapes or transcripts of conversation which are obtained thereby."

**3.** Because Maryland Rule 729 does not proscribe such a review, it is possible even in a multi-judge court, that the same judge who has made a judicial determination that probable cause exists for the issuance of a search and seizure warrant should, in a later suppression hearing be called upon to reverse his earlier judicial determination.

such electronic surveillance in the affidavit constituted a deception upon the court which issued the warrant; secondarily, it was asserted that the affidavit did not set forth sufficient underlying circumstances that the alleged informants were credible and reliable.

Counsel particularized his contentions by asserting that the police had commenced the illegal eavesdropping prior to March 3, 1972; [4] that they had occupied an adjacent apartment "and did use it in such a manner as to make it obvious that its [use] was for the purpose of illegal eavesdropping"; that the affiant had requested, and been refused, the cooperation of the apartment engineer in installing a wire tap; that it was subsequently discovered that the room in which the building's telephone equipment was located had been forcibly entered, that a wire tap had been found upon the telephone of the building engineer and that a telephone company serviceman had found a wire tap upon a tenant's telephone.

When Judge Mathias indicated to counsel that he would not permit him, in challenging the existence of probable cause, to go beyond the confines of the affidavit, counsel proffered to offer evidence: (a) that a Mrs. Dunn, the resident manager of the apartment building, would testify

---

4. In a pretrial motion under Maryland Rule 728 the petitioner, *inter alia,* unsuccessfully sought to obtain discovery of whether or not any electronic surveillance had been conducted in the course of the investigation as to any of the defendants; and if so, the means, dates, places, devices employed, etc. When this motion came on before the hearing judge (Loveless, J.) the Assistant State's Attorney vigorously resisted on the ground that the subject matter was outside the scope of Maryland Rule 728 and that the validity, *vel non,* of the search warrant stood or fell upon the allegations within the confines of the "four corners" of the affidavit. When pressed for a definitive statement by the hearing judge he first stated that "to the best of his knowledge" he knew of "no exculpatory evidence." When the court pointed out the "wariness" of his reply and urged a more explicit response, a recess was requested for consultation with the State's Attorney, since the matter involved a "policy decision." After consultation with several of the State's Attorney's personnel the prosecutor, rather equivocally, related that after a number of conversations with Detective Snow, a reading of the affidavit and the police report, "from this basis I know of no either authorized or unauthorized tap *on the premises that were searched* in the warrant." When further pressed by the court as to any electronic surveillance, it was stated that "as a result of my conversations" he knew of "none." (It was not made clear as to whether or not the response as to electronic surveillance was limited, as was the reply concerning a wire tap, to use "on the premises that were searched.")

that she had been contacted, prior to March 3, 1972, by Detective Snow and other officers, had been requested to give them a key to apartment 918, then vacant, which had a common wall with the apartment of Carter (apartment 926), and that with the use of such keys the police had come and gone at their leisure; (b) that the apartment switchboard operator, Mrs. Gordon, would testify that a Mr. Spaulding, a C. & P. Telephone Company serviceman, in the course of his regular duties, had reported to her that he had found a "tenant's phone was tapped"; (c) that the building engineer, Mr. Garrett, would testify that prior to March 3, 1972, he had been contacted by Detective Snow and other officers and had been requested to assist them in installing a wire tap; that he refused without the exhibition of a court order, as a result of which he himself had become a "suspect" and discovered a tap on his telephone through a connection in the "phone room"; that additionally he had received information from the building's "security people" and had personally observed that the room for the telephone equipment had been forcibly opened shortly after his refusal of cooperation; (d) that Detective Snow [the affiant] would testify that he and other police agents had installed one or more wire taps on phones in the building, had overheard and recorded conversations therefrom and that at least one of such wire taps had been made pursuant to court order; (e) that the witnesses would testify that both prior to and after March 3rd illegal electronic surveillance had been conducted by the police, that a wire tap was placed upon the premises of one Hardy and that the defendant's apartment had been subjected to such electronic surveillance.

Notwithstanding the proffer, no such testimony was received — or allowed; in denying the motion Judge Mathias ruled that the affidavit itself sufficiently established the existence of probable cause for the issuance of the warrant and "[as] to the validity of the search warrant the court will not take any additional evidence."

The Court of Special Appeals, in affirming the petitioner's conviction, in an unreported *per curiam, Carter v. State* [No. 404, Sept. Term, 1973, decided March 14, 1974], had "no

difficulty in finding that ample probable cause was established" [from the affidavit]. Carter's contention that he had been denied due process of law "when, at the hearing on his motion to suppress, the hearing judge declined to hear testimony as to possible wiretapping or eavesdropping, with the fruits of such primary illegality tainting the probable cause for the issuance of the warrant," was glossed over by simply finding "it unnecessary to deal at this time with this troublesome question, because the direct police observations, which we have held sufficient to establish probable cause, are not even arguably the fruits of some poisonous tree." That court, in passing, opined that "[i]t is by no means certain that, even if an unconstitutional wiretap or unconstitutional eavesdrop could be shown, that the fruits of such primary illegality could be used to diminish facially adequate probable cause."

We granted certiorari because it appeared that if an unlawful wire tap or electronic surveillance had been used that the fruits of any such illegality could be of significance in tainting evidence which otherwise facially set forth a basis for the existence of such probable cause.

As early as 1956 the General Assembly, in enacting the Maryland Wire Tapping Act, declared that "[t]he right of the people to be secure against unreasonable interception of telephonic and telegraphic communications shall not be violated"; it further declared it to be the public policy of this state "that the detection of the guilty does not justify investigative methods which infringe upon the liberties of the innocent." *See* Maryland Code (1957, 1971 Repl. Vol.) Art. 35, § 92 [now codified in Courts and Judicial Proceedings Article as § 10-401]. *See also Robert v. State,* 220 Md. 159, 169, 151 A. 2d 737, 742 (1959); *Manger v. State,* 214 Md. 71, 75-76, 133 A. 2d 78, 80-81 (1957). That Act, providing that "[o]nly evidence obtained in conformity with the provisions of this subtitle shall be admissible in evidence," (Article 35, § 97), prohibited the interception of telephonic and telegraphic communications etc., except upon an *ex parte* order issued by a judge of a court of general jurisdiction, upon a verified application of the Attorney

General, or any State's Attorney, upon the substantive grounds, and in accordance with the procedure specified in Art. 35, § 94 [now Courts and Judicial Proceedings Article, § 10-403]. The provisions specified in § 94 for the issuance of an *ex parte* order for the interception of a telephonic or telegraphic communication were equated, in both *Robert v. State, supra,* and *Manger v. State, supra,* with applications setting forth facts, generally similar to those required for the issuance of a search warrant.

Complementary to the provisions of the Maryland Wire Tapping Act, the General Assembly, by Ch. 706 of the Acts of 1959, enacted Maryland Code (1957, 1971 Repl. Vol.) Art. 27, §§ 125A-D, making it a misdemeanor for any person "to use any electronic device or other device or equipment of any type whatsoever in such manner as to overhear or record any part of the conversation or words spoken to or by any person in private conversation without the knowledge or consent, expressed or implied, of that other person." Art. 27, § 125A (a).[5] That statute, however, exempted from its applicability such acts when done pursuant to an *ex parte* court order. Art. 27, § 125A (b) and (c). See also Art. 35, § 94.

In enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, Congress "unquestionably intended it as an offspring" of the trilogy of eavesdropping cases decided during 1966 and 1967 by the United States Supreme Court in *Osborn v. United States,* 385 U. S. 323 (1966) (upholding the use of a court authorized recording device and the admissibility of a recording of a conversation between an investigator, who had a relative on a jury panel, and the petitioner, a lawyer, who expressed an

---

5. Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 125D (d), defines "wiretapping and/or eavesdropping device" and "device" to include "every device, instrument, apparatus, or equipment, which is designed or especially redesigned to be adapted or actually adapted for the purpose of (1) secretly overhearing or reporting any part of the conversation or words spoken to or by any person in private conversation without the knowledge or consent, expressed or implied, of that person, (2) intercepting or obtaining or attempting to obtain the whole or any part of a telephonic or telegraphic communication without the knowledge and consent of the participants thereto. . . ."

interest in approaching the juror); [6] *Berger v. New York*, 388 U. S. 41 (1967) (striking down New York's permissive eavesdropping statute, New York Code Crim. Proc. § 318-a, under which a court order permitted the installation of a recording device in an attorney's office for a period of 60 days, because the statute was "too broad in its sweep resulting in a trespassory intrusion into a constitutionally protected area and ... violative of the Fourth and Fourteenth Amendments"); and in *Katz v. United States*, 389 U. S. 347 (1967) (holding the unlawful use of an electronic listening and recording device attached to the outside of a telephone booth without any prior judicial sanction as being in violation of the Fourth Amendment). *See State v. Siegel*, 266 Md. 256, 264, 292 A. 2d 86, 90 (1972). The Act represents a comprehensive attempt by Congress to promote more effective control of crime while protecting the privacy of individual thought and expression; much of Title III was drawn to meet the constitutional requirements for electronic surveillance enunciated by the Supreme Court in *Berger* and in *Katz. United States v. United States District Court*, 407 U. S. 297, 302 (1972).

18 U.S.C. §§ 2510-2520 comprehensively provides for the authorization of electronic surveillance but only when conducted in accord with its standards. The classes of crimes within its scope are specified in § 2516; such surveillance is subject to prior court order; both wire and oral communications are within its protection. Section 2518 sets forth the detailed and particularized application necessary to obtain such an order, as well as carefully circumscribed conditions for its use. Among other things, § 2518 (10)(a) permits any aggrieved person, in any trial or proceeding, in or before any court, to move to suppress the contents of any intercepted wire or oral communication, or *evidence derived therefrom*, on the ground that its interception was unlawful, or that the order of authorization was insufficient on its face, or that the interception was not made in conformity with the order of authorization or approval. Section 2518 (9)

---

**6.** *See also* Lopez v. United States, 373 U. S. 427 (1963).

requires that the defendant be furnished the contents of any such interception, or *evidence derived therefrom* not less than ten days before the trial, etc., else the contents of such intercepted communication, or *evidence derived therefrom,* "shall not be received in evidence or otherwise disclosed in any trial."

18 U.S.C. § 2515 provides:

> "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and *no evidence derived therefrom* may be received in evidence in any trial, . . . in or before any court, grand jury, . . . or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter." (Emphasis supplied.)

In *State v. Siegel, supra,* Judge Digges, who wrote the opinion for the Court, after a thorough examination of the holdings in *Osborn, Berger* and *Katz,* and a complete analysis of the provisions in 18 U.S.C. § 2518, found that the statute was in conformity with the holdings in *Osborn,* provided for judicial intervention, the chief failing found in *Katz,* and responded to the "four basic problem areas" involving the scope of the New York statute, enumerated in *Berger.* Thus, satisfied that the statute gratified the shortcomings found in *Katz* and *Berger,* the court concluded that "Title III is not violative of the Fourth Amendment." 266 Md. at 268-71, 292 A. 2d at 93-94.

We further noted in *Siegel* that the federal act is "not self-executing as applied to the states"; that § 2516 (2) provided for an application to be made by the prosecuting attorney of any state or political subdivision, in conformity with § 2518 if *"authorized by a statute of that state."* Holding that although a state act which is more closely circumscribed than the federal law is certainly permissible, under the holdings in *Robert v. State, supra,* any such state statute cannot be less restrictive than the federal statute, and finding the provisions of Art. 35, §§ 92-99 and Art. 27,

§§ 125A-D, to be such "applicable state statutes" as envisioned under § 2516 (2), the Court concluded that "compliance must be had with whichever law is more constricting, be it federal or state," and that the provisions of Title III, found to be constitutional, "may be properly implemented" by state statute. 266 Md. at 272, 292 A. 2d at 95.

In holding that the surveillance in *Siegel* "failed to meet certain preconditions designed to protect appellee's constitutional rights, the evidence that arose from it must be suppressed," the Court rejected a rationalization of "substantial compliance" with the provisions of 18 U.S.C. § 2518 by stating that "[t]he statute sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path." 266 Md. at 274, 292 A. 2d at 95.

In *United States v. United States District Court, supra,* although the Court held that the provisions of 18 U.S.C. § 2511 (3)(c) did not constitute a grant of authority upon the authorization of the Attorney General to conduct a warrantless surveillance in a *domestic* security case, it pointed out that there was no question of doubt "as to the necessity of obtaining a warrant in the surveillance of crimes unrelated to the national security interest," citing both *Katz v. United States, supra,* and *Berger v. New York, supra.* 407 U. S. at 308.

In *United States v. Giordano,* 416 U. S. 505 (1974), the Court construed 18 U.S.C. § 2516 (1) to limit the power to authorize wire tap applications to the Attorney General and to any Assistant Attorney General he might designate, but not to include the Executive Assistant to the Attorney General. In pointing out that that interpretation of § 2516 (1) was supported by the purpose of the Act, effectively to prohibit all interceptions of oral or wire communications except those specifically provided for, Mr. Justice White, who delivered the majority opinion for the Court, stated:

> "The purpose of the legislation, which was passed in 1968, was effectively to prohibit, on the pain of criminal and civil penalties, all interceptions of oral

and wire communications, except those specifically provided for in the Act, most notably those interceptions permitted to law enforcement officers when authorized by court order in connection with the investigation of the serious crimes listed in § 2516. Judicial wiretap orders must be preceded by applications containing prescribed information,. § 2518 (1). The judge must make certain findings before authorizing interceptions, including the existence of probable cause, § 2518 (3). The orders themselves must particularize the extent and nature of the interceptions that they authorize, § 2518 (4), and they expire within a specified time unless expressly extended by a judge based on further application by enforcement officials, § 2518 (5). Judicial supervision of the progress of the interception is provided for, § 2518 (6), as is official control of the custody of any recordings or tapes produced by the interceptions carried out pursuant to the order, § 2518 (8). The Act also contains provisions specifying the circumstances and procedures under and by which aggrieved persons may seek and obtain orders for the suppression of intercepted wire or oral communications sought to be used in evidence by the Government. § 2518 (10)(a)." 416 U. S. at 514-15. (Footnote omitted.)

The Court concluded "that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." 416 U. S. at 528. *Compare United States v. Chavez,* 416 U. S. 562 (1974).

In applying the provisions of § 2518 (10)(a)(i), providing for the suppression of evidence on the ground the communication was "unlawfully intercepted," it was stated:

"The words 'unlawfully intercepted' are themselves not limited to constitutional violations, and we think Congress intended to require suppression

where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." 416 U. S. at 527.

In holding that not only the primary but derivative evidence as well secured by the interceptions under the court orders must be suppressed under § 2518, upon a motion made under § 2518 (10)(a), Mr. Justice White, after pointing out that in the Government's application for an extension of the interception order it was sought not only to intercept the conversations of Giordano, who alone was expressly named in the initial application and order, but of nine other named persons who were alleged to be involved with Giordano, stated:

"It is apparent from the foregoing that the communications intercepted pursuant to the extension order were evidence derived from the communications invalidly intercepted pursuant to the initial order. In the first place, the application sought and the order granted authority to intercept the communications of various named individuals not mentioned in the initial order. It is plain from the affidavit submitted that information about most of these persons was obtained through the initial illegal interceptions." 416 U. S. at 531-32.

Finding that the results of the conversations overheard under the initial order were essential, both in fact and in law, to any extension of the intercept authority, the Court concluded that the "communications intercepted under the extension order are derivative evidence and must be suppressed." 416 U. S. at 533.

See also United States v. Bernstein, 509 F. 2d 996 (4th Cir. 1975) [The Daily Record, February 10, 1975], holding that Title III provides not only a right not to have unlawful intercepts used in court, but does more: it creates a right not

to be overheard except in conformity with its provisions, citing 18 U.S.C. § 2511 (1). That Court concluded "from the unequivocal language of Title III that Congress intended any unlawful invasion of an aggrieved person's privacy to be sufficient harm in itself to require suppression. *Cf.* United States v. Giordano, 416 U. S. 505, 524-29 (1974)." 509 F. 2d at 1004.

Under our holdings in *Siegel* and the holdings in *Giordano,* any electronic surveillance may be conducted only when done in accord with the rigid constraints imposed by 18 U.S.C. §§ 2510-2520.[7] Thus, if Carter "was a party to any intercepted wire or oral communication, or a person against whom the interception was directed" he, as an "aggrieved person" (§ 2510 (11)), would be entitled under § 2518 (10)(a)(i) to move "to suppress the contents of any intercepted wire or oral communication, or *evidence derived therefrom,*" if such communication was "unlawfully intercepted," in violation of the statute.

A "conversation" is within the Fourth Amendment's protection and the use of electronic devices to capture it is a "search" within the meaning of that amendment. *See Berger v. New York,* 388 U. S. at 51, citing *Olmstead v. United States,* 277 U. S. 438 (1928).

In *Katz v. United States, supra,* the Court, finding that "the Fourth Amendment protects people, not places" (389 U. S. at 351), rejected the "trespass doctrine" found necessary in *Olmstead v. United States, supra,* and in *Goldman v. United States,* 316 U. S. 129 (1942), as no longer controlling; and in finding that the recordation of the petitioner's words while using the telephone booth to which the device had been attached constituted a " 'search and seizure' within the meaning of the Fourth Amendment," expressly held, citing *Silverman v. United States,* 365 U. S. 505, 511 (1961), "that the Fourth Amendment governs not only the seizure of tangible items, but extends as well to the recording of oral

---

**7.** *See also* State v. Graziano, 17 Md. App. 276, 301 A. 2d 36 (1973); State v. Lee, 16 Md. App. 296, 295 A. 2d 812 (1972). See as well Robert v. State, 220 Md. 159, 151 A. 2d 737 (1959), where the interception was not in accordance with the provisions of the Maryland Wire Tapping Act under Maryland Code (1957) Art. 35, §§ 92-99.

statements, overheard without any 'technical trespass under
... local property laws'" and "that the reach of that
[Fourth] Amendment cannot turn upon the presence or
absence of a physical intrusion into any given enclosure."
389 U. S. at 353.

*See also Desist v. United States*, 394 U. S. 244 (1969),
holding that *Katz* was to be applied prospectively only.

As early as 1920, in *Silverthorne Lumber Co. v. United
States*, 251 U. S. 385, the Supreme Court held that rec-
ords initially seized "without a shadow of authority,"
which had been inspected and copied by the District
Attorney, could not supply a valid basis for a subpoena
to produce the original of the documents — which
had been ordered returned. Mr. Justice Holmes, who
delivered the majority opinion of the Court, stated that
"the knowledge gained by the Government's own wrong
cannot be used by it in the way proposed," and con-
cluding that to hold otherwise would reduce "the Fourth
Amendment to a form of words," stated that "[t]he
essence of a provision forbidding the acquisition of evi-
dence in a certain way is that not merely evidence so
acquired shall not be used before the court but that it shall
not be used at all" — recognizing, of course, an exception
when such knowledge "is gained from an independent
source." 251 U. S. at 392.

In *Nardone v. United States*, 302 U. S. 379 (1937), the
Court reversed the petitioner's convictions on their first trial
because they were procured by wire tap evidence in violation
of § 605 of the Communications Act of 1934. Upon
conviction, following a new trial, the case revisited the Court
in *Nardone v. United States*, 308 U. S. 338 (1939), presenting
as its only question: " 'whether the [trial] judge improperly
refused to allow the accused to examine the prosecution as to
the uses to which it had put the information,' " — which had
vitiated the original conviction. In reversing the convictions
and remanding the case to the District Court for further
proceedings the Court held that a violation of § 605 not only
rendered the intercepted conversations themselves in-
admissible, but rendered inadmissible as well evidence

procured through the use of knowledge gained from such conversations.[8]

Mr. Justice Frankfurter, who delivered the majority opinion for the Court, stated:

> "This Court found that the logically relevant proof which Congress had outlawed, it outlawed because 'inconsistent with ethical standards and destructive of personal liberty.' 302 U. S. 379, 383. To forbid the direct use of methods thus characterized but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.' " 308 U. S. at 340.

Finding the holdings in *Silverthorne Lumber Co. v. United States, supra,* pertinent, it was concluded that " 'knowledge gained by the Government's own wrong cannot be used by it' simply because it is used derivatively."

Pointing out that the burden is on the accused in the first instance to establish to the trial court's satisfaction that wire tapping was unlawfully employed, the Court found that once that is established "the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree." 308 U. S. at 341.

In *Wong Sun v. United States,* 371 U. S. 471 (1963), the Supreme Court for the first time specifically held that verbal evidence may be the fruit of official illegality under the Fourth Amendment, along with the more common tangible fruits of unwarranted intrusion.[9] Holding that the

---

**8.** The decisions in Nardone v. United States, 302 U. S. 379 (1937) and 308 U. S. 338 (1939), concerning suppression are reflected in 18 U.S.C. §§ 2515 and 2518 (10)(a), as "existing law." *See* S. Rep. No. 1097, 90th Cong., 2d Sess., 98 (1968), set forth in United States v. Giordano, 416 U. S. at 528, n. 17.

**9.** In a long line of pre-Miranda cases, beginning with Prescoe v. State, 231 Md. 486, 191 A. 2d 226 (1963); and followed in Stewart v. State, 232 Md. 318, 193 A. 2d 40 (1963); Peal v. State, 232 Md. 329, 193 A. 2d 53 (1963); Bean v. State, 234 Md. 432, 199 A. 2d 773 (1964); Price v. State, 235 Md. 417, 201 A. 2d 847, *cert. denied,* 379 U. S. 867 (1964); Mefford v. State, 235 Md. 497, 201 A. 2d 824 (1964), *cert. denied,* 380 U. S. 937 (1965); McChan v. State, 238 Md. 149, 207 A. 2d 632 (1965), *vacated & remanded,* 384 U. S. 893,

words spoken by Blackie Toy when the police illegally entered his house were not usable against him because they were the fruits of a physical invasion of his premises, which violated the Fourth Amendment, Mr. Justice Brennan, writing for the majority, after citing from *Silverthorne Lumber Co. v. United States, supra,* stated:

"The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman v. United States,* 365 U. S. 505, that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to

*cert. denied,* 384 U. S. 1021 (1966); Streams v. State, 238 Md. 278, 208 A. 2d 614 (1965); Dyson v. State, 238 Md. 398, 209 A. 2d 609 (1965), *vacated & remanded,* 383 U. S. 106 (1966); Dailey v. State, 239 Md. 596, 212 A. 2d 257 (1965), *cert. denied,* 384 U. S. 913 (1966); and Crowe v. State, 240 Md. 144, 213 A. 2d 558 (1965), this Court has rejected the application of the holdings in Wong Sun where it had been contended that an illegal arrest rendered inadmissible a subsequent confession, but where *the evidence established that the confession was factually shown —* and in some cases conceded — to have been freely and voluntarily elicited.

In Anderson v. State, 237 Md. 45, 205 A. 2d 281 (1964); Johnson v. State, 238 Md. 140, 241 Md. 328, 207 A. 2d 643, 217 A. 2d 343 (1965), *cert. denied,* 382 U. S. 1013 (1966); McChan v. State, *supra;* and Dailey v. State, *supra,* this Court held that the doctrines enunciated in Wong Sun and in Fahy v. Connecticut, 375 U. S. 85 (1963), were inapplicable where it was shown that the defendants' confessions had factually been freely and voluntarily given and there was no evidence to establish that the confrontation with any evidence allegedly illegally seized had induced the confessions. In none of our cases have we heretofore been confronted with the admissibility or use of either tangible or verbal evidence allegedly obtained by, or derived from, an illegal search and seizure to bring into application the taint of such derivative evidence as a "fruit of the poisonous tree" under the holdings originally announced and applied in Nardone v. United States, 308 U. S. 338 (1939), and followed in Wong Sun.

In the light of the holdings in Miranda v. Arizona, 384 U. S. 436 (1966), Davis v. Mississippi, 394 U. S. 721, 724 (1969), pointing out that there is no distinction under the Fourth Amendment between tangible and intangible evidence obtained after an illegal arrest, and in Michigan v. Tucker, 417 U. S. 433, 445 (1974), indicating that the statements of the defendant, as the "fruits" of police conduct are within the defendant's Fourth Amendment rights, we must leave for another time the question of the continuing viability of our holdings in Prescoe v. State, supra, and its progeny.

enforce the basic constitutional policies. *McGinnis v. United States,* 227 F. 2d 598. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. *See Nueslein v. District of Columbia,* 115 F. 2d 690. Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. . . ." (Footnote omitted.) 371 U. S. at 485-86.

In holding that the exclusion of Toy's declarations which led the police to the recovery of narcotics required the exclusion of the narcotics seized, the opinion stated further:

"[T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were 'come at *by the exploitation of that illegality*' and hence that they may not be used against Toy." (Emphasis supplied.) 371 U. S. at 488.

*See Alderman v. United States,* 394 U. S. 165 at 177-78 (1969); *Berger v. New York,* 388 U. S. at 52.

The Supreme Court of Pennsylvania in *Commonwealth v. Cephas,* 447 Pa. 500, 291 A. 2d 106 (1972), held that the defendant's Fourth Amendment rights were violated by the evidentiary use at his trial — over objection and after a motion to suppress — of the testimony of a witness who was found in the defendant's apartment during the course of an admittedly illegal search.

Pointing out that the police had "no independent source" of information as to the existence of the witness, or the information which she gave them, the court found the verbal

evidence offered through her came within the protection of the exclusionary rule if such evidence was a "fruit" of the illegality. Applying the reasoning and holdings in *Wong Sun, Nardone* and *Silverthorne Lumber Company,* that court concluded that the inculpatory statement obtained by the police from the witness during the course of the unlawful search and seizure constituted an "exploitation" of the illegality and not by a means sufficiently distinguishable to be purged of the primary taint. In holding that the witness's testimony should have been suppressed, the court stated: "[t]o permit the prosecution to use a witness obtained as a direct result of an illegal search will frustrate the objectives of the Fourth Amendment just as much as would use of a tangible article found during the same search, thus, the Fourth Amendment would be turned into a mere 'form of words'." 447 Pa. at 511, 291 A. 2d at 112.

In *Alderman v. United States, supra,* the Supreme Court held that a petitioner is entitled to the suppression of evidence where, in violation of the Fourth Amendment his own conversations were unlawfully overheard, or where the conversations so heard occurred upon his premises — whether or not he was present or participated therein — but that suppression can be successfully urged only by those whose rights were violated by the search itself and not those, such as codefendants or co-conspirators, who have no special standing, but who are aggrieved solely by the introduction of the damaging evidence.[10] The Court in *Alderman* refused to accept the government's *ex parte* determination that " 'no overheard conversation in which any of the petitioners participated is arguably relevant to this prosecution,' " and rejected as well the government's motion that the surveillance records should be subjected to an *in camera* inspection by the trial judge who would then turn over to the petitioners only "those materials arguably relevant to their prosecution."

---

**10.** *See* Manger v. State, 214 Md. 71, 74, 133 A. 2d 78, 80 (1957), where defendants, not parties to the intercepted conversations, were held without standing to object to the introduction of evidence obtained in violation of the Maryland Wire Tapping Act.

Mr. Justice White, in writing for the majority, prefaced the opinion by stating:

> "The exclusionary rule fashioned in *Weeks v. United States,* 232 U. S. 383 (1914), and *Mapp v. Ohio,* 367 U. S. 643 (1961), excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights. Fruits of such evidence are excluded as well. *Silverthorne Lumber Co. v. United States,* 251 U. S. 385, 391-92 (1920). Because the Amendment now affords protection against the uninvited ear, oral statements, if illegally overheard, and their fruits are also subject to suppression. *Silverman v. United States,* 365 U. S. 505 (1961); *Katz v. United States,* 389 U. S. 347 (1967)." 394 U. S. at 171.

In holding that a violation of the Fourth Amendment "would occur if the United States unlawfully overheard conversations of a petitioner himself or conversations occurring on his premises, whether or not he was present or participated in those conversations" by an invasion of the conversational privacy of the home owner, he stated for the Court:

> "If the police make an unwarranted search of a house and seize tangible property belonging to third parties — even a transcript of a third-party conversation — the homeowner may object to its use against him, not because he had any interest in the seized items as 'effects' protected by the Fourth Amendment, but because they were the fruits of an unauthorized search of his house, which is itself expressly protected by the Fourth Amendment. Nothing seen or found on the premises may legally form the basis for an arrest or search warrant or for testimony at the homeowner's trial, since the prosecution would be using the fruits of a Fourth Amendment violation. *Silverthorne Lumber Co. v. United States,* 251 U. S. 385 (1920); *Johnson v.*

*United States,* 333 U. S. 10 (1948); *Wong Sun v. United States,* 371 U. S. 471 (1963).

. . . Like physical evidence which might be seized, overheard conversations are fruits of an illegal entry and are inadmissible in evidence. *Silverman v. United States,* 365 U. S. 505 (1961); *Wong Sun v. United States, supra."* (Footnote omitted.) 394 U. S. at 176-78.

In rejecting the notion that the suppression would have to be limited to the "homeowner's own conversations" and comparing the installation of an electronic device to a secreting by the police themselves upon the premises in order to observe activities and overhear conversations therein, it was further stated:

"We adhere to the established view in this Court that the right to be secure in one's house against unauthorized intrusion is not limited to protection against a policeman viewing or seizing tangible property — 'papers' and 'effects.' Otherwise, the express security for the home provided by the Fourth Amendment would approach redundancy. The rights of the owner of the premises are as clearly invaded when the police enter and install a listening device in his house as they are when the entry is made to undertake a warrantless search for tangible property; and the prosecution as surely employs the fruits of an illegal search of the home when it offers overheard third-party conversations as it does when it introduces tangible evidence belonging not to the homeowner, but to others. . . ." (Citing *Silverman v. United States,* 365 U. S. 505, 511-12 (1961).) 394 U. S. at 179-80.

Finding that the standard for disclosure is "arguable relevance," the Court concluded that "if the hearings are to be more than a formality and petitioners not left entirely to reliance on government testimony," there should be turned over to them the records of those overheard conversations

which the government is not entitled to use in building its case against them and that such surveillance records, as to which any petitioner has standing to object, should be turned over to him without being screened *in camera* by the trial judge.

*See also United States v. Fox*, 455 F. 2d 131 (5th Cir. 1972), holding that where illegal eavesdropping had occurred the defendant had not only the right to inspect the intercept log, but the right to examine appropriate officials, notwithstanding the District Court's *in camera* determination that illegal surveillance had no "arguable relevance" or "possible connection" with his conviction. *See* further 18 U.S.C. § 2518 (10)(a).

In *Washburn v. State*, 19 Md. App. 187, 310 A. 2d 176 (1973), the appellant contended that the search and seizure warrant was invalid, arguing that he should have been granted a hearing at which he may have been able to demonstrate that the police ascertained the identity of an informant as a result of an illegal wire tap; that if the wire tap was illegal the knowledge the police secured concerning the informant was "the product of illegally intercepted evidence."

Although the court found an attenuation in that the dealings between the trooper and the appellant "so diluted the original taint of the information as to make it virtually non-existent," Judge Gilbert, in writing for the court, stated:

> "Once it is shown that the identity of a State witness was discovered through an illegal wiretap, that witness's information — whether by way of testimony at trial or as support for a finding of probable cause — must be excluded unless the State can establish: (1) that the identity of the witness originated from an independent source, or (2) that the taint, resulting from the witness's identity being discovered as a result of an originally unlawful wiretap, has become so attenuated that there is no rational basis to exclude the evidence obtained from the witness. *United States v.*

*Marder,* 474 F. 2d 1192 (5th Cir. 1973); *People v. Scharfstein,* 52 Misc. 2d 976, 277 N.Y.S.2d 516 (Sup. Ct. 1967). We decline to adopt a rule which would, *ipso facto,* exclude all testimony of a witness identified as a consequence of an illegal search." (Footnote omitted.) 19 Md. App. at 201-02, 310 A. 2d at 184-85.

*See People v. Mendez,* 28 App.Div.2d 727, 281 N.Y.S.2d 608 (2d Dept. 1967), where a motion to controvert a search warrant and to suppress evidence obtained thereunder, based upon the fruits of an alleged illegal wire tap order, had been denied and the court remanded the case for an evidentiary hearing. Following that hearing the conviction was affirmed in *People v. Mendez,* 28 N.Y.2d 94, 320 N.Y.S.2d 39, 268 N.E.2d 778, *cert. denied,* 404 U.S. 911 (1971), after it had been established that the identity of the witness, the victim of an abortion, was found "attenuated by intervening acts and forces."

The weight of authority in the state courts is in accord with the view that evidence derived as a result of a prior illegal search for, or seizure of, property, or knowledge gained through such an illegal search and seizure, cannot be used, because of its taint, as a valid basis to justify the existence of probable cause in a subsequent search and seizure warrant. *See* Annot., 143 A.L.R. 135-140 (1943); Annot., 50 A.L.R.2d 531, 569 (1956).

Thus, if any conversation of Carter or any conversation overheard upon his premises — whether he was present and participating in it or not — was subjected to a "search and seizure" by the use of any wire tap or eavesdropping device, in violation of his rights under the Fourth Amendment, as explicated in *Alderman v. United States, supra,* in *Silverman v. United States, supra,* and *Katz v. United States, supra,* any information garnered as "fruits" of such primary illegality and "come upon" by the "exploitation" of that illegality cannot, under the holdings in *Silverthorne Lumber Co. v. United States, supra, Nardone v. United States, supra, Wong Sun v. United States, supra* and *Alderman v. United States, supra,* be used as derivative

evidence for an application for a search and seizure warrant; to hold otherwise would permit the prosecution to use knowledge acquired in violation of the Fourth Amendment and "gained by its own wrong." The doctrine of the "fruit of the poisonous tree" although it excludes evidence obtained from or as a consequence of lawless official acts does not apply however if such evidence is "obtained from an 'independent source,'" or such "'connection may have become so attenuated so as to dissipate the taint.'" *See Costello v. United States*, 365 U. S. 265 at 280 (1961), citing *Silverthorne Lumber Co. v. United States, supra,* at 392 and *Nardone v. United States*, 308 U. S. 338, 341.

Our predecessors, in *Smith v. State*, 191 Md. 329, 62 A. 2d 287 (1948), *cert. denied,* 336 U. S. 925 (1949), found the "better rule" to be that "consideration of the showing of probable cause should be confined solely to the affidavit itself, and the *truth* of the alleged grounds stated in the affidavit cannot be controverted, as was done in the cases, by receiving the testimony of the accused and other witnesses." Recognizing that although such result would not prevent the accused from showing that the affiant had not in fact sworn to the affidavit, the Court held that "testimony should not be taken to *controvert the truth* of the allegations [in the affidavit]." 191 Md. at 335-36, 62 A. 2d at 289-90. (Emphasis supplied.) This rule has been consistently followed in *Goss v. State,* 198 Md. 350, 354, 84 A. 2d 57, 58 (1951); *Adams v. State,* 200 Md. 133, 139, 88 A. 2d 556, 559 (1952); *Harris v. State,* 203 Md. 165, 172, 99 A. 2d 725, 728 (1953); *Tischler v. State,* 206 Md. 386, 390-91, 111 A. 2d 655, 657 (1955); *Burrell v. State,* 207 Md. 278, 280, 113 A. 2d 884, 885 (1955); *Henderson v. State,* 243 Md. 342, 344, 221 A. 2d 76, 77 (1966); and *Tucker v. State,* 244 Md. 488, 499-500, 224 A. 2d 111, 117-18 (1966), *cert. denied,* 386 U. S. 1024 (1967), where Judge McWilliams, for the Court, after carefully examining our decisions and those of the Supreme Court, declined to hold that our earlier cases "were wrongly decided." Our holdings in this regard are in accord with the majority rule. *See* Annot., 5 A.L.R.2d 394 (1949).

When Judge Mathias rejected the receipt of the evidence

proffered by the petitioner Carter he patently was relying on the rule enunciated in *Smith v. State, supra,* and the cases in which it has been consistently applied. Although the petitioner in his motion to suppress asserted that a "deception" had been practiced upon the issuing court — in the failure to disclose the use of electronic surveillance — his principal thrust was that an illegal electronic surveillance by the police was the derivative source of the facts set forth in the affidavit and that such illegal conduct tainted the facts so discovered and resulted from exploitation of such surveillance. The petitioner's attack was thus not directed in challenging the truth of the grounds set forth in the affidavit nor an attempt to controvert them, but rather challenged the legality of the source by which such facts, assuming them to be true, had been acquired.

Without diminishing the viability of our rule proscribing any controversion of the truth of the grounds stated in an affidavit in application for a search and seizure warrant, we find that the proffer made by counsel in support of his motion to suppress challenging the source of those facts, in view of the clear statutory language in 18 U.S.C. § 2515 and § 2518 (10)(a) — authorizing a suppression upon such grounds — and the holdings by the United States Supreme Court in *Alderman v. United States, supra,* and in *United States v. United States District Court, supra,* required an evidentiary hearing. *See Gelbard v. United States,* 408 U. S. 41, 50-51 (1972), holding that § 2515 is "central to the legislative scheme," that "its importance as a protection for the 'victim of an unlawful invasion of privacy' could not be more clear" ; and that "§ 2515 serves not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also 'to protect the integrity of court and administrative proceedings.'" The Court there held that "to order a grand jury witness, on pain of imprisonment [for contempt], to disclose evidence that § 2515 bars in unequivocal terms is both to thwart the congressional objective of protecting individual privacy by excluding such evidence and to entangle the courts in the

illegal acts of Government agents." 408 U. S. at 51.[11] (Footnote omitted.)

We think the Court of Appeals of Kentucky stated the rule well in *White v. Commonwealth,* 221 Ky. 535, 299 S. W. 168 (1927), cited with approval in *Clark v. Commonwealth,* 288 Ky. 845, 157 S.W.2d 485 (1941), when it said:

> "While it is the rule in this state that, where the affidavit and search warrant are regular and sufficient on their face, the defendant cannot go behind the search warrant for the purpose of showing that the facts stated in the affidavit are not true, the case under consideration is not of that kind. Here the attack is not on the truth of the facts stated in the affidavit, but on the method by which the affiant obtained the information of the facts. If it were the rule that an officer could make an illegal search of one's premises and then use the information thus obtained as the basis for a search warrant authorizing him to search the premises, then the whole purpose of the constitutional provision against unreasonable search and seizure would be defeated. Manifestly, it is just as unlawful for an officer to make an illegal search of one's premises for the purpose of acquiring information of facts on which to base an affidavit as it is to make an illegal search for the purpose of obtaining evidence on which to base a conviction. We are therefore of the opinion that the defendant . . . may go behind the search warrant and affidavit for the purpose of showing that knowledge of the facts stated in the affidavit was obtained by an illegal search made by the affiant." 221 Ky. at 537, 299 S. W. at 169.

*See also Brooks v. State,* 13 Md. App. 151, 154-56, 282 A. 2d 516, 518-19 (1971), *cert. denied,* 264 Md. 746, 749, 750

---

11. In Gelbard v. United States, 408 U. S. 41, 50 (1972), the Supreme Court set forth the report of the Senate committee (S. Rep. No. 1097, 90th Cong., 2d Sess., at 69 (1968)), concerning the evidentiary prohibition of § 2515 and emphasized therefrom that "[t]he perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings."

(1972); and *Frankis v. State,* 11 Md. App. 534, 275 A. 2d 532 (1971).

As the petitioner points out in his brief, it is impossible to determine from the affidavit whether the "confidential reliable source of information" — itself a rather semantical phrase — which had given Detective Snow "completely true information," "over a period of approximately two years," was indeed a person (although not referred to as an "informant"), or was a "device." It does appear that this "source" in the first instance disclosed the existence of "Chunkhead" and his transactional relationship with Carter, and led to certain surveillances; additionally, that same "source" "telephonically" related to the affiant details concerning the delivery of heroin and that a large delivery was scheduled for the morning of June 9, 1972.

If an affidavit for a search and seizure warrant contains improper information which should not be considered by the court [in issuing the warrant] the court is nonetheless justified in issuing the warrant if additionally the affidavit contains within it sufficient proper information to show the existence of probable cause. *See Tucker v. State, supra; Shrout v. State,* 238 Md. 170, 175, 208 A. 2d 585, 588 (1965); *Kapler v. State,* 194 Md. 580, 587-88, 71 A. 2d 860, 863 (1950); and *Bratburd v. State,* 193 Md. 352, 357, 66 A. 2d 792, 794 (1949). *See also Adams v. State,* 200 Md. 133, 139, 88 A. 2d 556, 559 (1952), where it similarly had been proffered that *some* of the evidence on which the affidavit was based had been obtained by "wire-tapping" in violation of the Maryland Wire Tapping Act. Although fully cognizant of this precept, in view of the repetitive use of the ambiguous phrase, "confidential reliable source of information," as the possible origin of facts set forth in the affidavit, and in view of the totality of evidence proffered by the petitioner — particularly his proffer concerning the use of the adjacent apartment and that his phone had been tapped — in his assertion that the facts set forth in the affidavit originated with and became tainted as a result of an alleged illegal electronic surveillance, we cannot here apply the principle. In view of the possible taint of the facts set forth in the affidavit, which otherwise facially appears to provide a basis

for probable cause, we are unable to conclude, as did the Court of Special Appeals, that there is "no difficulty in finding that ample probable cause was established." Contrariwise, we believe that the evidence proffered prima facie mandated an evidentiary hearing on the motion to suppress in order to determine whether or not the facts to which affidavit was made were tainted. Because of the error on the part of the trial judge in applying the rationale in *Smith v. State, supra,* restricting the attack to the "four corners" of the affidavit and in not affording the petitioner an opportunity to produce evidence as to whether or not any of the data had been "come upon" by an exploitation of an asserted electronic surveillance, we are precluded, under our holdings in *Gill v. State,* 265 Md. 350, 289 A. 2d 575 (1972), from making a "restricted remand" for such a hearing limited to this issue, but are, instead, required to set aside and reverse the judgment and order a new trial.

Upon remand the trial court shall conduct an evidentiary hearing to determine in the first instance whether or not any wire tapping or electronic eavesdropping was conducted in violation of Carter's rights under the Fourth Amendment, or under the provisions of 18 U.S.C. §§ 2510-2520. In such proceedings Carter must be given the opportunity to show that the facts sworn to in the affidavit as a basis for "probable cause" were obtained either directly or derivatively as an exploitation of any such illegal "search." *See United States v. United States District Court, supra; Alderman v. United States, supra; Nardone v. United States, supra; People v. Mendez, supra. See also United States v. Giordano, supra; State v. Siegel, supra;* and 18 U.S.C. §§ 2515, 2518.

Although initially the petitioner must go forward with evidence to show that the facts in the affidavit were obtained as "fruits of the poisonous tree," if it is established that any such illegal wire tap or eavesdrop was employed, it then becomes the ultimate burden of the prosecution to show that such facts were discovered independently, untainted by any such illegal wire tap or eavesdropping, or were so "attenuated as to dissipate the taint" of the primary illegality. *United States v. United States District Court,*

*supra; Alderman v. United States, supra; Nardone v. United States, supra; United States v. Fox, supra;* and *Washburn v. State, supra.*

In the context of an adversary proceeding, in order to be able to rebut any evidence by the prosecution that the facts set forth in the affidavit were untainted, and to gratify the standard of "arguable relevance," the prosecution is required to disclose to the petitioner the intercept logs and all materials and records of "those overheard conversations which the government was not entitled to use in building its case against" him; Carter possesses as well the right "to cross-examine the appropriate officials in regard to the connection between those records and the case made against him" in application for the warrant. *Alderman v. United States, supra. In accord, United States v. United States District Court, supra; United States v. Fox, supra.* This disclosure, however, is limited to those records concerning Carter's own conversations or those taking place upon his premises or those conversations in connection with which he is an "aggrieved person." *See Alderman v. United States, supra;* and 18 U.S.C. § 2510 (11).

In such an evidentiary hearing the trial judge "should confine the evidence presented by both sides to that which is material to the question of possible violation of the petitioner's Fourth Amendment rights, to the content of conversations illegally overheard by surveillance which violated those rights — [both constitutional and under 18 U.S.C. §§ 2510-2520] and to the relevance of such conversations to the petitioner's" subsequent subjection to search and seizure under the warrant. *See Alderman v. United States, supra,* at 186.

> *Judgment of the Court of Special Appeals reversed; case remanded to that Court with directions to reverse the judgment of the Circuit Court for Prince George's County and remand the case for a new trial; costs to be paid by Prince George's County, Maryland.*